

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-13-00758-CR

Cesar **PEREZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 365th Judicial District Court, Maverick County, Texas
Trial Court No. 12-12-07159-MCRAJA
Honorable Amado J. Abascal, III, Judge Presiding

Opinion by: Sandee Bryan Marion, Justice

Sitting: Karen Angelini, Justice
Sandee Bryan Marion, Justice
Patricia O. Alvarez, Justice

Delivered and Filed: July 2, 2014

AFFIRMED

A jury found appellant, Cesar Perez, guilty of aggregated theft of property valued between $1,500 and $20,000 by a public servant pursuant to one scheme or continuing course of conduct, and the trial court assessed punishment at eight years' confinement, probated. In two issues on appeal, appellant asserts the evidence is insufficient to (1) corroborate the accomplice witness testimony, and (2) sustain the conviction. We affirm.

## BACKGROUND

The State indicted appellant, Martha Zamarripa, and Elisa Martinez of aggregated theft of property valued between $1,500 and $20,000 while acting as public servants pursuant to one scheme and continuing course of conduct. During the relevant time period, appellant served as Justice of the Peace for Precinct 2, Maverick County (hereinafter, "the JP court"). Zamarripa and Martinez worked as secretaries for the JP court and were named as co-defendants; however, prior to appellant's trial, they pled no contest to the charges against them and received deferred adjudication in exchange for their testimony at appellant's trial. The duties of the JP court included collecting payments from individuals who received traffic citations within Maverick County. The State alleged appellant, with the assistance of Zamarripa and Martinez, unlawfully appropriated money from seven individuals who made payments at the JP court. The relevant portion of the indictment reads:

Theft by a Public Servant

And it is further presented to the Court that the said, Cesar Perez and Martha Zamarripa and Elisa Martinez, hereafter styled the Defendants, and before the presentment of this indictment, in the County of Maverick and State of Texas, did then and there, pursuant to one scheme or continuing course of conduct that began on or about August 20, 2007, and continued until on or about October 3, 2008, unlawfully appropriate, by acquiring or otherwise exercising control over property, to–wit: United States currency or its equivalent, and the aggregate value of the property obtained was $1500 or more but less than $20000, from Ruben Montemayor, on behalf of Maverick County, Texas, the owner thereof, with intent to deprive the owner of the property, and the defendants were then and there a public servant, namely, Cesar Perez was Justice of the Peace, Precinct 2 of Maverick County, Texas, and Martha Zamarripa was a secretary for Justice of the Peace, Precinct 2 of Maverick County, Texas, and Elisa Martinez was a secretary for Justice of the Peace, Precinct 2 of Maverick County, Texas and such property appropriated by the defendants had therefore come into their custody, possession or control by virtue of their status as such public servant, . . .

**Non-Accomplice Testimony**

The first witness to testify was Andres Rodriguez, who testified he received "a lot" of traffic citations from various agencies. Rodriguez testified that he received a letter on August 9, 2007, from a law firm that had been retained by Maverick County to collect an outstanding balance of $2,163.85. On August 17, he responded to the letter by contacting Ruben Montemayor of the Maverick County Collections Department about starting a payment plan. Montemayor told Rodriguez he needed to speak to the JP court. According to Rodriguez, appellant told him a payment of $600 would take care of the entire amount. On August 20, Rodriguez paid $100 to a woman at the JP court, later identified as Martinez, and received a handwritten receipt (State's Exhibit 2) from her. Rodriguez further testified that, later the same day, appellant called him to tell him he "owed more." On August 21, Rodriguez went back to the JP court, paid another $100 to the JP court and received a second handwritten receipt (State's Exhibit 3) from a different woman, later identified as Zamarripa. Later that day, Rodriguez went to the Collections Department to make payments on other outstanding citations. While there, he was told the payments he made to the JP court did not appear in the department's records. Instead, the records showed his citations out of the JP court had been dismissed that day. After Rodriguez showed his handwritten receipts to the Collections Department, he was referred to Eloy Garcia, an investigator with the Maverick County District Attorney's Office. Investigator Garcia asked Rodriguez if he would be willing to make an additional $200 payment to the JP court if Investigator Garcia provided him with the money. Rodriguez agreed, and, on August 24, he went to the JP court, gave the money to appellant, and received a third handwritten receipt (State's Exhibit 4) from appellant. Rodriguez then went home and reported what happened to Investigator Garcia.

Next, Carlos Pereda, an auditor for Maverick County, testified. He said Montemayor contacted him and stated there was "a problem . . . in the JP office because . . . somebody had

walked in with a receipt that wasn't recorded in the books." Pereda stated his office could not find a payment corresponding to the handwritten receipts. Pereda testified that when people make payments at the JP court, a computerized receipt (referred to as a "Pro-Com" receipt) should be generated; therefore, he was troubled by the fact that Rodriguez's receipts were handwritten, which meant the payments were taken outside the system. Pereda next attempted to discover whether the money Rodriguez paid had been deposited with Maverick County. He could find no deposit with the county. Pereda then contacted the district attorney's office and spoke to Investigator Garcia and Robert Little, an assistant district attorney. During their discussion, they decided to ask Rodriguez to take additional money to the JP court. Rodriguez agreed and after he paid the money to appellant, Pereda's office waited for a month or two to see if the money would be deposited; however, it never was. Pereda stated their suspicions about the JP court were also raised by the fact that the previous Precinct 2 Justice of the Peace collected approximately $484,000 over a fifteen-month period before she left office; but when appellant took office, the collections for his first nine months amounted to only $85,519 and for his next full fiscal year, he collected only $172,714—approximately $260,000 over a twenty-one-month period, significantly less than the prior Precinct 2 Justice of the Peace.

Investigator Garcia testified that Pereda initially informed the district attorney's office about money missing from the JP court and referred Investigator Garcia to Rodriguez. Investigator Garcia stated Rodriguez informed him of the $200 he had already paid to the JP court and provided him the two handwritten receipts he had received. Investigator Garcia testified he received approval to provide Rodriguez with $200 in order to find out where the money being paid to the JP court was "winding up." According to Investigator Garcia, Rodriguez agreed to take the $200 provided to him to the JP court. After Rodriguez gave the $200 to appellant, Rodriguez gave Investigator Garcia the third handwritten receipt he received from appellant. Investigator Garcia

further testified that approximately one week later, the Texas Rangers took over the investigation and executed a search of the JP court office and seized evidence related to the investigation. After the execution of the search warrant, appellant and both co-defendants were taken to a Department of Public Safety office where Investigator Garcia witnessed appellant give Zamarripa "a hard stare."

Juan Perez testified he received a collection letter in 2008 for a 2005 traffic citation, which he had not paid. Perez stated he went to the JP court and gave a woman a money order for $257.35 for which he received a handwritten receipt (State's Exhibit 6). He testified he did not deal directly with appellant, and his citation was subsequently dismissed.

Ricardo Hernandez testified he accrued numerous citations over the course of several years that he simply "threw away." Hernandez testified he gave $600 cash to Martinez and received six Pro-Com receipts (State's Exhibits 9–14) referencing payments totaling $500 and two handwritten receipts referencing payments totaling $100 (State's Exhibits 7 & 8). After he paid the $600, Hernandez was not contacted by the JP court or the collections department again.

Next, Guadalupe Galindo testified she received a letter from the Collections Department regarding a citation her deceased husband, Ildefonso Galindo, received before his death. Galindo stated she had already paid several citations and produced a handwritten receipt (State's Exhibit 16) from the JP court referencing a $225.85 cash payment made on March 24, 2008.

Gabriel Garcia testified that in April or May of 2008, he spoke to appellant about a traffic citation and appellant told him that "it would be $300 to take care of it . . . ." By that, Gabriel said appellant meant he would clear his entire driving record, which showed several outstanding citations. Gabriel testified he gave the cash directly to appellant, but did not receive a receipt. A few months later, Gabriel received a notice that his citation was still pending. Gabriel stated he

went back to the JP court and spoke to one of the women in the office. As far as he knows, the citations were later removed from his record.

Next, Montemayor, the Collections Supervisor for Maverick County, testified that the department first became aware of an issue with the JP court when several people, who had received a collection letter from his department, began contacting the department stating that they had already paid their outstanding citations. His concern grew when Rodriguez presented the handwritten receipts he had received from the JP court and because the corresponding citations showed they had been "dismissed" in the Pro-Com system. Montemayor also testified that the investigation uncovered two additional handwritten receipts: one issued to Juan Delgado for $150 (State's Exhibit 17) and one issued to Rosalinda Cervera Parra for $238 (State's Exhibit 18). Montemayor also testified extensively regarding State's Exhibit 23, citation record print-outs from the Pro-Com system submitted under a business records affidavit. State's Exhibit 23 contained Pro-Com records from seven individuals who had received citations: Rodriguez, Galindo, Hernandez, Cervera Parra, Perez, Delgado, and Gabriel Garcia. The documents show that a number of citations had been entered as "dismissed" in the Pro-Com system. Montemayor confirmed that when the "dismissed" disposition is used, the county does not collect money for the citations.

With respect to the citation records, Montemayor testified: (1) Rodriguez's records show that on August 21, 2007, seven citations were "dismissed" in the Pro-Com system, and the county did not receive any of the $400 Rodriguez paid to the JP court; (2) Galindo's records show that on March 24, 2008, one citation was "dismissed," and the county did not receive any of the $225.85 Galindo paid to the JP court; (3) Hernandez's records show that on December 14, 2007, the county collected $500 of Hernandez's $600 payment, leaving $100 unaccounted for; (4) Cervera Parra's records show that on April 8, 2008, two citations were "dismissed," and the county received $25

of Cervera Parra's $238 payment, leaving $213 unaccounted for; (5) Perez's records show that on February 15, 2008, one citation was "dismissed," and the county received $52 of Perez's $257.35 payment, leaving $205.35 unaccounted for;[1] (6) Delgado's records show that on October 10, 2008, one citation was "dismissed," and the county did not receive any of the $150 Delgado paid to the JP court; and (7) Gabriel Garcia's records show that on April 15, 2008, two citations were "dismissed," and the county did not receive any of the $300 Gabriel Garcia paid to the JP court.[2] Montemayor further testified he trained appellant how to use the Pro-Com system, and stated appellant knew how to enter citation dispositions in the Pro-Com system, including the "dismissed" disposition that does not require the county to collect any money.

Finally, Ignacio Banda, retired computer supervisor for Maverick County, testified that the JP court often experienced computer problems that were reported by appellant, Zamarripa, and Martinez. He also confirmed Zamarripa reported that "there were a lot of dismissed cases going on," and that she wanted him to relay the information to the county auditor, which he did. Banda testified Zamarripa reported this information on more than one occasion.

**Accomplice Testimony**

Martinez testified she signed the first handwritten receipt given to Rodriguez for his $100 payment, Galindo's handwritten receipt for $225.85, and Parra's handwritten receipt for $238. She also confirmed Zamarripa signed Rodriguez's second handwritten receipt for $100, Perez's handwritten receipt for $257.35, both of Hernandez's handwritten receipts totaling $100, and Delgado's handwritten receipt for $150. She stated appellant signed Rodriguez's third handwritten

---

[1] Both parties agree Perez paid $257.35 and the county received $52.00 of that payment. Therefore, the correct amount unaccounted for should be $205.35. However, both parties reference Perez's amount unaccounted for as $235.35. This appears to be merely a mathematical error.

[2] No receipt was produced for this payment. This amount is based on Gabriel's testimony and corresponding affidavit.

receipt referencing his third payment of $200. Martinez also testified appellant knew how to operate the Pro-Com system and knew how to enter a "dismissed" disposition. Martinez denied stealing any of the money unaccounted for and stated that handwritten receipts were often used because the Pro-Com system was "always down." She testified appellant would meet with offenders during and after normal business hours and would dismiss "a lot" of citations. She also confirmed that she provided the Texas Rangers a written statement. In that statement, she stated that if the JP court was doing things correctly, they would issue Pro-Com receipts; otherwise, they would issue handwritten receipts if appellant was going to keep the money. On cross-examination, she explained that although Hernandez received six Pro-Com receipts, the two handwritten receipts might have been issued because the Pro-Com system may have frozen or broken down.

Next, Zamarripa testified she took a $100 payment from Rodriguez. She stated she gave the money to appellant upon his request and received $25 "not to say anything." Appellant kept the remainder. With respect to Rodriguez's third handwritten receipt, Zamarripa testified she filled out Rodriguez's name; however, the remainder of the receipt was completed by appellant. She stated she did not fill out the entire receipt because she "didn't feel that [she] should be doing things—being involved in . . . dismissing citations for money." Zamarripa also stated she received $25 of Rodriguez's $200 payment.

Zamarripa also confirmed she filled out the handwritten receipt for Perez's $257.35 payment; however, she stated she did not keep any money from that payment and that appellant "probably got it." She also confirmed appellant knew how to operate the Pro-Com system and knew how to enter citations as "dismissed." She testified appellant would dismiss "a lot" of citations, and that appellant had asked her if there was "anything we can do about getting money." When the Texas Rangers became involved, Zamarripa was asked to go to a Department of Public Safety office. When she arrived, appellant approached her truck and told her "to shut up and don't

say anything," which she interpreted as a threat. After her interview with the Texas Rangers, Zamarripa did not return to the JP court and appellant terminated her employment on December 30, 2008.

## ACCOMPLICE WITNESS CORROBORATION

In his first issue, appellant asserts the evidence is insufficient to corroborate the accomplice witness testimony.

### 1. Standard of Review

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). Article 38.14, known as the accomplice witness rule, does not require the non-accomplice evidence to be sufficient in itself to establish the accused's guilt beyond a reasonable doubt. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). To determine whether there is sufficient corroborating evidence, we exclude all accomplice witness testimony from consideration and then examine the remaining portions of the record to see if there is "*some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment." *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007) (emphasis in original). The non-accomplice evidence may be direct or circumstantial, and must simply link the accused in some way to the commission of the crime, such that rational jurors could conclude this evidence sufficiently tended to connect appellant to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). The "tends-to-connect" standard does not present a high threshold. *Cantelon v. State*, 85 S.W.3d 457, 461 (Tex. App.—Austin 2002, no pet.). Even insignificant circumstances may satisfy this standard. *Id*. No precise rule can be formulated regarding the amount of evidence that is required to corroborate the testimony of an accomplice witness; each

case must be judged on its own facts. *Gill*, 873 S.W.2d at 48. When reviewing corroboration under the accomplice witness rule, we view the evidence in the light most favorable to the jury's verdict. *Id*.

## 2. Analysis

Excluding the testimony of Zamarripa and Martinez, appellant argues the only evidence tending to connect him to the offense was the testimony of Rodriguez and Gabriel Garcia. Therefore, he asserts "the only evidence introduced showed that appellant could have received only $700 of the county's money." We disagree.

Appellant's argument relies on a lack of certain evidence, namely, evidence that shows he personally received the remainder of the money unaccounted for that was collected by the JP court. His argument, however, overlooks other evidence presented in this case. In addition to the testimony of Rodriguez and Gabriel Garcia, the State introduced testimony from Galindo, Hernandez, Perez, and Montemayor; the handwritten receipts issued by the JP court; and the citation record print-outs from the Pro-Com system. Appellant concedes the State presented sufficient evidence tending to connect him to $700 of the money unaccounted for—$400 from Rodriguez and $300 from Gabriel Garcia. However, in addition to this amount, Galindo, Hernandez, and Perez testified they paid a total of $583.20 that was collected by the JP court. The State also introduced the handwritten receipts which confirm the money was collected by the JP court. Montemayor's testimony established that out of the $583.20 collected, Maverick County received only $52, leaving $531.20 unaccounted for. Cervera Parra and Delgado did not testify at trial. However, the State introduced the handwritten receipts they received from the JP court into evidence, totaling an additional $388 that was collected by the JP court. Montemayor testified that out of the $388 paid by Cervera Parra and Delgado, Maverick County received only $25, leaving

$363 unaccounted for.  Additionally, the Pro-Com records show that on or about the time the JP court collected the money from these individuals, many of their citations were "dismissed."

We conclude the combined weight of this non-accomplice evidence, viewed in the light most favorable to the jury's verdict, sufficiently tends to connect appellant to the commission of aggregated theft of property valued between $1,500 and $20,000 by a public servant pursuant to one scheme or continuing course of conduct.  Therefore, we hold Zamarripa's and Martinez's testimony was sufficiently corroborated by other evidence tending to connect appellant to the charged offense.

## SUFFICIENCY OF THE EVIDENCE

In his second issue, appellant asserts the evidence is factually insufficient to support his conviction.  Having concluded there is sufficient non-accomplice evidence corroborating the testimony of Zamarripa and Martinez, we will include their testimony in our evaluation of the legal sufficiency of all the evidence to support appellant's conviction.

### 1.  Standard of Review

Although appellant challenges the factual sufficiency of the evidence, the Texas Court of Criminal Appeals has held "the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010); *accord Tiller v. State*, 362 S.W.3d 125, 127 (Tex. App.—San Antonio 2011, pet. ref'd).  Under this standard, when reviewing the sufficiency of the evidence to support a criminal conviction, we view the evidence in the light most favorable to the verdict to determine whether any rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks*, 323 S.W.3d at 895.  When applying this standard, we are "required to defer to the jury's

credibility and weight determinations because the jury is the *sole* judge of the witness' credibility and the weight to be given their testimony." *Brooks*, 323 S.W.3d at 899 (citing *Jackson*, 443 U.S. at 319) (emphasis in original). Each fact need not point directly and independently to the guilt of the accused, as long as the cumulative force of all the evidence, coupled with the reasonable inferences to be drawn therefrom, is sufficient to support the conviction. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence and may alone be sufficient to establish guilt. *Id.* We do not ask whether we believe the evidence at trial established guilt beyond a reasonable doubt, instead, we consider only whether the jury reached a rational decision. *Brooks*, 323 S.W.3d at 899.

## 2. Analysis

As alleged in this case, a person commits the offense of theft if he unlawfully appropriates property with intent to deprive the owner of property valued at $1,500 or more, but less than $20,000. TEX. PENAL CODE ANN. § 31.03(a), (e)(4)(A) (West 2011). "Appropriation of property is unlawful if it is without the owner's effective consent." *Id.* § 31.03(b)(1). A person acts with intent when it is the person's conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). Intent may be inferred from the circumstances. *See Moreno v. State*, 702 S.W.2d 636, 641 (Tex. Crim. App. 1986). Multiple thefts committed pursuant to one scheme or continuing course of conduct, even if committed at different times and against different victims, may be aggregated within one offense for the purposes of determining the grade of the offense. TEX. PENAL CODE § 31.09; *see De La Fuente v. State*, 264 S.W.3d 302, 318 (Tex. App.—San Antonio 2008, pet. ref'd). "Where an indictment charges an individual with the appropriation of property in an aggregated amount pursuant to one scheme or continuing course of conduct, the State is not required to prove each individual appropriation." *De La Fuente*, 264 S.W.3d at 318 (citing *Lehman v. State*, 792 S.W.2d 82, 84 (Tex. Crim. App. 1990)). "The evidence is sufficient

if the State shows the defendant illegally appropriated enough property to meet the aggregated value alleged." *Id.*

On appeal, appellant asserts the evidence is insufficient because there is no evidence to show that he committed each individual theft pursuant to the alleged scheme or continuing course of conduct. He argues the evidence is insufficient because the only evidence connecting him to the unlawful appropriation of money was the testimony of Rodriguez, Gabriel Garcia, and Zamarripa's testimony that appellant "probably got [Perez's $205.35]," or a total of $905.35.

Here, appellant's argument again overlooks much of the evidence presented in this case. Appellant concedes the evidence is sufficient to support that he stole $905.35. However, the evidence also shows that an additional $688.85 was collected by the JP court that was never received by Maverick County. In addition to the testimony of Galindo, Hernandez, Perez, and Montemayor; the handwritten receipts issued by the JP court; and the traffic record print outs from the Pro-Com system discussed above, Martinez testified the handwritten receipts were used when appellant would keep the money. Both Zamarripa and Martinez testified they did not personally take any of the money unaccounted for (with the exception of Zamarripa accepting $50 given to her by appellant not to say anything). Zamarripa also testified appellant was involved in dismissing citations for money, and reported the situation to Banda on numerous occasions.

The testimony of Zamarripa, Martinez, the Maverick County employees, and the witnesses who made payments at the JP court, along with the handwritten receipts and Pro-Com records, constitute sufficient evidence for a reasonable jury to find appellant guilty of the alleged offense. As the sole judge of the weight and credibility to give witnesses' testimony, the jury was entitled to weigh the witnesses' testimony and credibility and to accept or reject it. *See Brooks*, 323 S.W.3d at 899. Viewing the evidence in the light most favorable to the verdict, we hold the evidence is

sufficient to support beyond a reasonable doubt that appellant unlawfully appropriated more than $1,500 with the intent to deprive Maverick County of this sum.

## CONCLUSION

We conclude the record contains sufficient independent evidence tending to connect appellant to the alleged offense, and the evidence is sufficient to support appellant's conviction of aggregated theft of property valued between $1,500 and $20,000 while acting as a public servant pursuant to one scheme and continuing course of conduct. Therefore, we affirm the trial court's judgment.

Sandee Bryan Marion, Justice

PUBLISH