

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-13-00788-CR

The **STATE** of Texas

v.

Cynthia **AMBROSE**,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2012CR10002
Honorable Sid L. Harle, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice
Concurring Opinion by: Marialyn Barnard, Justice

Sitting:        Sandee Bryan Marion, Chief Justice
                Marialyn Barnard, Justice
                Luz Elena D. Chapa, Justice

Delivered and Filed:  January 7, 2015

REVERSED AND REMANDED

The State appeals the trial court's order granting Cynthia Ambrose a new trial. The trial court granted Ambrose's motion on the basis that the trial court failed to *sua sponte* submit an accomplice-witness instruction to the jury and that its failure egregiously harmed Ambrose. The State challenges both components of the trial court's basis for granting the motion. Because we agree that the absence of an accomplice-witness instruction did not egregiously harm Ambrose, we reverse and remand the case to the trial court.

## BACKGROUND

In December 2012, Ambrose, a kindergarten teacher, was charged with Official Oppression by subjecting A.N., a child at her school, to mistreatment by directing and allowing other children to strike him. Ambrose pled not guilty.

### The State's Case

Barbara Ramirez, a kindergarten teacher at Salinas Elementary in the Judson Independent School District, testified that she and Ambrose each taught a separate kindergarten class at the school. Salinas Elementary had a "buddy system," which Ramirez explained was used by teachers to correct a child's behavioral problem before sending the child to the principal's office and to minimize the loss of a child's instructional time. Ramirez also testified that Judson ISD prohibited the use of corporal punishment to discipline students.

Ramirez further testified that in early May 2012, A.N. (a student in her class) had aggressively hit another child's back and "couldn't keep his hands to himself." She decided to use the buddy system and walked A.N. to Ambrose's classroom. Ramirez told Ambrose about A.N. bullying and hitting other students. Ambrose instructed A.N. to sit in a chair beside her desk and asked him why he was bullying other students. According to Ramirez, when A.N. did not respond, Ambrose said to the students in her class, "Come on, boys and girls, let's line up and let's bully [A.N.]." Ramirez stated that several students stood up and Ambrose again said, "Come on, let's hit him." The first few students rubbed or patted A.N. on the back, and according to Ramirez, Ambrose said, "Well, let's hit him harder." Ramirez testified that about seven students lined up and struck A.N. Ramirez stated that she left A.N. in Ambrose's classroom and later sent another student to bring A.N. back to her classroom.

Ramirez testified that about two weeks later she decided to report the incident when she heard Ambrose instruct a child to pinch another student. Ramirez reported both incidents to the

school's administration, specifically to Principal Jeffrey Large and Vice Principal Gerrie Spellmann.

During cross-examination, Ramirez admitted that she was given immunity to testify truthfully, and that her failure to timely report the incident was a criminal offense. She also admitted that she heard Ambrose tell the last student who struck A.N., "Okay, that's too hard, not that hard."

Large testified that Ramirez came to his office and described what had happened. He conferred with Spellmann, and they decided to investigate Ramirez's allegations. He testified that he spoke with Ambrose the next morning. According to Large's testimony, Ambrose told him that Ramirez had brought a student over to her classroom because the student was bullying others. He further testified that Ambrose "told us that she instructed the students to hit the other student but not hard. She said that I believe two or three students hit the student and then a fourth student hit too hard and then she stopped it immediately after that." He also said that he informed Ambrose that this conduct violated Judson ISD's policy against mistreatment of students.

On cross-examination, Large stated that it was probably true that there was reason to doubt Ramirez's report because two weeks had passed from the incident in Ambrose's classroom to the day when Ramirez reported it. He also said that because of Ambrose's reputation as a good teacher and disciplinarian, he had no reason to believe that Ambrose would do something like this. Large stated that he sent Ambrose back to her classroom after he met with her.

Spellmann provided additional testimony about Judson ISD's policy against corporal punishment. She also described the buddy system: "The buddy system is if a teacher has a child in their classroom and they feel like they need a break away, a time away then they buddy up with another classroom." The system could be used if a child is misbehaving or as a reward for a student. She explained that the buddy system is not used to have a teacher discipline a child. She also

testified to being present during Large's meeting with Ambrose. When Spellmann was asked what Ambrose had said, Spellmann reviewed a prior statement to refresh her memory about what exactly Ambrose had told her. Spellmann then testified, "[Ambrose] let us know that she had instructed her students to hit the student on the arm, but not too hard so that the student would know how it felt to be bullied." She testified that after her interviews with the students, it seemed to her that the students were told to strike A.N. On cross-examination, Spellmann stated that it was quite unbelievable that a person would wait two weeks to report this incident.

The State called two other teachers at Salinas Elementary to testify about what Ambrose told them in the teacher's lounge after her meeting with Large and Spellmann. Christine Wienstel testified that Ambrose had said "someone told on her about something." On cross-examination, Wienstel admitted that she was not sure if Ambrose had used those exact words. Sharon Hons testified that when she asked Ambrose why she seemed upset, Ambrose "just said someone had tattletaled on her." On cross-examination, Hons admitted that Ambrose did not say more about what had upset her.

The State also called A.N., who was seven years old at the time of trial, and A.N.'s two older brothers to testify. A.N. initially testified that he did not know the difference between a truth and a lie; he did not know when his birthday was; he did not know who Ambrose was; and he did not remember when Ramirez took him to see Ambrose or an incident when a teacher told other students to hit him. When A.N. was asked if he remembered his earlier talk with a prosecutor, A.N. said "wait," and then indicated that he was confused. He testified that he remembered when Ramirez took him "on the buddy system" to another teacher's class because he would not be quiet one day. He said he did not remember what happened in that classroom, but indicated that he remembered other kids hitting his back. When asked if he remembered how many kids hit him, he responded, "I think like 21." On cross-examination, A.N. said he did not tell his parents what had

happened. A.N.'s two older brothers each testified that A.N. had told them on a bus ride home one day that a teacher told other students to hit him. A.N.'s older brothers did not tell their parents because, as both testified, they did not believe A.N.

*Defense's Case*

Ambrose was the sole witness who testified in her defense at the guilt-innocence phase of trial. She denied instructing other students to hit another student. Ambrose testified that Ramirez had walked into her classroom, complaining that A.N. was kicking and punching other students. According to Ambrose, she asked Ramirez, "Do you want to scare [A.N.]? [Ramirez] said, Yes." Ambrose then testified that her class had heard the conversation and Ambrose asked them what they thought should happen. Ambrose stated, "[S]ome were saying time out, one of them did say he should get hit by the kids that he hit. So then I did say, Does anybody want to show him what it feels like?" According to Ambrose, before she knew it one of her students got up and hit A.N. Ambrose testified that there were a few more students who got up around A.N. and she told them to get away from A.N. "And it really did happen fast like Ms. Ramirez said," Ambrose explained. She concluded her direct examination with a denial that she intended for any student to hit A.N.

Ambrose also testified that she met with Large and Spellmann after the incident, and they told her to go back to her class and continue teaching. She also admitted to being present in the teacher's lounge, but denied saying someone had "tattletaled" on her. She explained at trial that she was mad that day because a friend of hers had been murdered by the friend's spouse, and Ambrose had learned that he would be attending the rosary.

On cross-examination, Ambrose was questioned about whether she thought the other witnesses had lied or perjured themselves. Her position was that Ramirez perjured herself about what was discussed and what had occurred in the classroom; Large and Spellmann perjured

themselves when they testified that she told them she instructed the students to hit A.N.; and that Wienstel had lied to the jury when testifying that Ambrose said someone tattled on her.

Ambrose admitted that she was a public servant, acting under color of state law in the classroom when Ramirez brought A.N. to her. She conceded that if a teacher subjected a student to discipline by corporal punishment, then it would constitute mistreating the student as well as an assault. Ambrose testified that she was aware of other teachers at Salinas Elementary and other schools having students hit other students, but denied that she did so.

## *Other Proceedings*

At the charge conference, there was no objection to the absence of an accomplice-witness instruction. Following closing arguments, the court recessed for forty-two minutes before the jury reached a verdict. The jury found Ambrose guilty. Ambrose elected to be sentenced by the court, which sentenced her to one year's confinement but suspended the sentence and placed her on community supervision. Ambrose hired new counsel to file a motion for new trial, arguing that she suffered egregious harm because the trial court failed to *sua sponte* instruct the jury on the accomplice-witness rule.

The trial court granted Ambrose's motion solely on the ground of charge error and denied the motion on the other grounds. In the trial court's findings of fact and conclusions of law, it concluded that Ramirez was an accomplice as a matter of law (and alternatively there was at least a fact issue regarding her status as an accomplice) and that the omission of an accomplice-witness instruction egregiously harmed Ambrose. The State appealed the trial court's order.

## STANDARD OF REVIEW & APPLICABLE LAW

A trial court must instruct the jury on the law applicable to the case. *Zamora v. State*, 411 S.W.3d 504, 513 (Tex. Crim. App. 2013). Article 38.14 of the Code of Criminal Procedure provides, "A conviction cannot be had upon the testimony of an accomplice unless corroborated

by other evidence tending to connect the defendant with the offense committed." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). The rule "does not require the non-accomplice evidence to be sufficient in itself to establish the accused's guilt beyond a reasonable doubt." *Perez v. State*, 437 S.W.3d 610, 616 (Tex. App.—San Antonio 2014, no pet.). When an accomplice witness's testimony implicates the defendant in the charged offense, the accomplice-witness instruction is law applicable to the case, and the trial court must instruct the jury on the rule even without a request. *Zamora*, 411 S.W.3d at 513-14.

In *State v. McKnight*, 213 S.W.3d 915, 916 (Tex. Crim. App. 2007) (per curiam), the Court of Criminal Appeals required courts of appeal to review a trial court's order granting a new trial for charge error under the harm standards of *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984). We no longer review a trial court's order granting a new trial under the traditional abuse-of-discretion standard. *State v. Sanchez*, 393 S.W.3d 798, 802 (Tex. App.—El Paso 2012, pet. ref'd) (citing *McKnight*, 213 S.W.3d at 915-16). In effect, *McKnight*'s holding requires a trial court to apply *Almanza*'s harm standards when ordering a new trial based on the trial court's failure to instruct the jury on the law applicable to the case. *See id.*

The degree of harm *Almanza* requires depends on whether the defendant timely objected to the absence of a proper jury instruction. *Id.* at 802. When the defendant preserves error at trial by timely objection to the absence of an accomplice-witness instruction, the record must establish only "some harm" to obtain reversal. *Id.* When, as here, there is no timely objection to the absence of an accomplice-witness instruction, we may affirm a trial court's order granting a new trial only if the record shows the defendant suffered egregious harm, which is when the omission of the instruction deprived the defendant of a fair and impartial trial. *Almanza*, 686 S.W.2d at 171. The egregious harm standard "is a difficult standard to meet," *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013), and usually requires corroborating evidence to be weaker than the "some

harm" standard. *See Herron v. State*, 86 S.W.3d 621, 633 (Tex. Crim. App. 2002) ("Obviously, all other things being equal, the non-accomplice evidence would have to be stronger than what is required in the egregious harm context."). *Almanza*'s higher, egregious harm standard is applied to further "the policy of encouraging the timely correction of errors, which is embodied both in Article 36.19 and in our own rules of appellate procedure." *Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006).

Egregious harm "affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Fulcher v. State*, 274 S.W.3d 713, 716 (Tex. App.—San Antonio 2008, pet. ref'd). In the context of failing to instruct the jury on the accomplice-witness rule, there is egregious harm when the corroborating evidence is "exceedingly weak—that is to say, evidence that, while it is legally sufficient to tend to connect, is nevertheless inherently unreliable, unbelievable, or dependent upon inferences from evidentiary fact to ultimate fact that a jury might readily reject." *Casanova v. State*, 383 S.W.3d 530, 539 (Tex. Crim. App. 2012). We must "inquire whether the jurors would have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991). In assessing the harm caused by failing to properly instruct the jury, we consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

## ANALYSIS

We assume without deciding that Ramirez was an accomplice, and consider whether the corroborating evidence—viewed in light of the jury charge, state of the evidence, arguments of counsel, and other considerations—was so exceedingly weak that Ambrose was deprived of a fair

and impartial trial. *See* TEX. R. APP. P. 47.1 (requiring us to hand down an opinion as brief as practicable while addressing issues necessary to our final disposition).

Ambrose agreed during her testimony that she was a public servant acting under the color of state law and that subjecting a child to corporal punishment through other students would constitute mistreatment. Thus, the only contested element of the charged offense was whether Ambrose intended to subject A.N. to being struck by other students. We therefore focus our analysis on evidence "tending to connect" Ambrose's intent to the intent alleged in the charge— that Ambrose intended that other students strike A.N. *Cf. Casanova*, 383 S.W.3d at 532-40 (considering corroborative evidence pertaining to the disputed element of intent in a drug possession case).

The non-accomplice corroborative evidence in the record is relatively strong. Initially, Ambrose admitted to saying something that prompted students in her classroom to get up and strike A.N. According to Ambrose, after one of her students suggested other students hit A.N., she asked her class, "Does anybody want to show him what it feels like?" Although Ambrose denied explicitly directing her students to hit A.N., her own testimony tended to connect her intent to the charged intent of subjecting A.N. to mistreatment by directing and allowing her students to strike him. Ambrose's own admissions tending to connect herself to the charged offense are not "inherently unreliable, unbelievable, or dependent upon inferences from evidentiary fact to ultimate fact." *See id.*

Large's and Spellmann's respective testimony also tended to connect Ambrose to the charged offense. When Large and Spellmann met with Ambrose to ask her about Ramirez's allegations, Ambrose admitted to instructing her students to hit A.N. Ambrose argues their testimony was "unbelievable" because each testified they thought what had happened in Ambrose's classroom was "unbelievable." This is mere equivocation; neither Large nor Spellmann

testified they actually did not believe Ambrose when she admitted to instructing students to hit A.N. Although Large and Spellmann sent Ambrose back to her classroom to teach, this does not render their testimony inherently unreliable. Evidence supported Ambrose was unlikely to return to her classroom and again subject her students to corporal punishment. Ambrose had a reputation for being a good teacher and good disciplinarian up until Ramirez's report, and Large admonished Ambrose during their meeting that Ambrose's admitted conduct violated Judson ISD policy.

The jury charge and the State's arguments emphasized the strength of the corroborating evidence and the weakness of Ambrose's contradictory testimony. The State's opening statement highlighted the expected inconsistency between Ambrose's likely testimony at trial and her prior statement to Large and Spellmann. No opening statement was given for the defense. After both sides rested their respective cases, the jurors were instructed that they were the exclusive judges of the witnesses' credibility and of the weight to be given to their testimony and could return a guilty verdict only if the State proved Ambrose committed the offense beyond a reasonable doubt.

Both sides' closing arguments focused on the credibility of the witnesses. The State argued there was no evidence any of them had an incentive to lie for each other. The State's closing argument emphasized, "Literally all of our witnesses corroborate each other. There was no corroboration on the defense's part." The defense focused on the inconsistent conduct of Ramirez, Large, and Spellmann; Ramirez waited two weeks to report Ambrose and Large and Spellmann sent Ambrose back to class after they met with her. The defense called Ramirez a "psychopathic liar" and suggested Large and Spellmann had a motive to falsely inculpate Ambrose to hold someone accountable. The jury returned a guilty verdict after only a forty-two minute recess. Thus, the evidence and other parts of the record support that the State's case would not have been rendered clearly and significantly less persuasive had the jury been instructed on the accomplice-witness rule.

Although Ambrose contends the credibility of Ramirez's testimony might have been impacted by the State granting her immunity to testify, and the State believed her testimony was "necessary" to a conviction, a proper harm analysis requires us to disregard Ramirez's testimony in determining whether Ambrose suffered egregious harm. *See De La Rosa v. State*, 919 S.W.2d 791, 796 (Tex. App.—San Antonio 1996, pet. ref'd) (noting that *Almanza*'s harm standard in accomplice-witness cases requires a reviewing court to disregard the accomplice testimony and consider only non-accomplice corroboration). These contentions do not show that the non-accomplice corroboration by the State's witnesses was inherently unreliable or unbelievable.

## CONCLUSION

We conclude that the sum of the non-accomplice corroboration from Principal Large and Vice Principal Spellmann, viewed together with Ambrose's admissions that she wanted to teach A.N. not to be a bully and had said something to her class that caused A.N. to be struck by other students, was not exceedingly weak in tending to connect Ambrose's actual intent to the requisite intent of subjecting A.N. to mistreatment. The inclusion of an accomplice-witness instruction would not have rendered the State's case clearly and significantly less persuasive so as to deprive Ambrose of a fair and impartial trial. Therefore, we conclude Ambrose did not suffer egregious harm and hold the trial court erred in granting Ambrose's motion for new trial. Accordingly, we reverse the trial court's order granting a new trial, and we remand this case for further proceedings.

Luz Elena D. Chapa, Justice

PUBLISH