# NO. 12-14-00167-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE MATTER OF T. H.,* | § | *APPEAL FROM THE* |
| | § | *COUNTY COURT AT LAW # 3* |
| *A JUVENILE* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

T.H. appeals a juvenile court's order committing him to the Texas Youth Commission for a determinate sentence of seventeen years. He raises one issue relating to the sufficiency of the evidence corroborating accomplice witness testimony. We affirm.

## BACKGROUND

On April 9, 2014, the State filed its first petition for an adjudication that T.H. had engaged in delinquent conduct. The State twice amended its petition, alleging that T.H. committed the offense of burglary of a habitation and that he has engaged in habitual felony conduct. The grand jury approved the State's second amended petition, and certified its approval to the juvenile court.[1]

T.H. pleaded "not true" to the allegations contained in the State's second amended petition, and a jury trial was held. The jury found it "true" that T.H. committed the offense of burglary of a habitation, as the State had alleged. It also found that T.H. engaged in delinquent conduct constituting habitual felony conduct, and that a disposition was required. The jury assessed T.H.'s punishment at seventeen years of commitment to the Texas Juvenile Justice Department with possible transfer to the Texas Department of Criminal Justice. This appeal followed.

## ACCOMPLICE WITNESS TESTIMONY

In his sole issue, T.H. contends that the State failed to develop evidence to sufficiently corroborate the testimony of an accomplice witness.

---

[1] The State's amended petition was also approved and certified by the grand jury.

**The Corroboration Requirement**

An adjudication of delinquent conduct cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence tending to connect the child with the alleged delinquent conduct. TEX. FAM. CODE ANN. § 54.03(e) (West 2014); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). Further, the corroboration is not sufficient if it merely shows the commission of the alleged conduct. *See* TEX. FAM. CODE ANN. § 54.03(e); TEX. CODE CRIM. PROC. ANN. art. 38.14.[2]

The corroborative evidence need not be legally sufficient in itself to connect the accused to a crime. *See Casanova v. State*, 383 S.W.3d 530, 538 (Tex. Crim. App. 2012). The evidence must simply link the accused to the commission of the crime in some way; no set amount of corroborating evidence is required for sufficiency purposes. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). "Each case must be judged on its own facts," and the courts will find sufficient corroboration if rational jurors could have found that the evidence sufficiently tended to connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Malone*, 253 S.W.3d at 257.

T.H. was alleged to have committed the offense of burglary of a habitation. A person commits burglary if, without the effective consent of the owner, he enters a habitation with intent to commit theft. *See* TEX. PENAL CODE ANN. § 30.02(a)(1) (West 2011). Evidence that the accused was in the company of an accomplice during a period that was close in time to the commission of the burglary, coupled with other suspicious circumstances, may connect the accused to the offense. *See Gill v. State*, 873 S.W.2d 45, 49 (Tex. Crim. App. 1994). And the opportunity to commit burglary may qualify as a "suspicious circumstance" tending to connect the accused to the crime. *See id.*

In determining whether there is sufficient corroborating evidence, we eliminate the accomplice evidence from our consideration and examine the remaining evidence to ascertain whether there is evidence of an incriminating nature that tends to connect T.H. with the burglary. *See Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993). This standard does not present a high threshold. *Perez v. State*, 437 S.W.3d 610, 616 (Tex. App.—San Antonio 2014, no pet.). We

---

[2] Because Section 54.03(e) contains requirements similar to those in article 38.14 of the code of criminal procedure, we look to opinions from the Texas Court of Criminal Appeals in addition to juvenile cases for guidance. *See In re D.A.B.*, No. 12-08-00406-CV, 2009 WL 2705882, at *2 (Tex. App.—Tyler 2009, pet. denied) (mem. op.); *In re K.B.*, 143 S.W.3d 194, 198 (Tex. App.—Waco 2004, no pet.).

view the nonaccomplice evidence in the light most favorable to the jury's verdict. *See Smith*, 332 S.W.3d at 442 ("[I]t is not appropriate for appellate courts to independently construe non[]accomplice evidence."); ***Bledsoe v. State***, 21 S.W.3d 615, 619 (Tex. App.—Tyler 2000, no pet.).

**The Evidence**

On or about December 24, 2013, Raquel Garza's home was burglarized. Only one item was stolen—a new television that Raquel purchased as a Christmas gift for her sixteen-year-old son, Angel.

     i. *The Nonaccomplice Evidence*

Angel Garza was the State's third witness to testify at trial. Angel was sixteen years old at the time of trial, and testified that in 2013, he received a television and Xbox on Christmas Eve as a gift from his mother. Angel's friend, S.M., learned that Angel was getting the television and Xbox for Christmas and went to Angel's house on Christmas Eve after being told the items were going to be delivered that day.[3] S.M. arrived at approximately 10:00 a.m., but the television and Xbox had not been delivered. Because the items were not scheduled to be delivered until noon, Angel and S.M. went to a local car wash in S.M.'s truck. Angel testified that when he was vacuuming the back seat of S.M.'s truck, he found a cellular phone. S.M. did not know who owned the phone, but told Angel that he could have the phone to listen to music. The phone was "dead" when Angel found it. But once the battery was charged, the phone "worked," although it could not be used to make phone calls or send text messages.

After they washed S.M.'s truck, Angel rode with S.M. to T.H.'s house. By the time they reached T.H.'s house, the television and Xbox had been delivered to the Garza home. Angel, S.M., and T.H. talked to each other on T.H.'s porch. Angel testified that T.H. and S.M. talked for "a little bit," and "[T.H.] was talking about something about hitting a lick."[4] According to Angel, T.H. told him, "You should try it. You should go with us, because it's going to put money in your pocket." Angel rejected T.H.'s offer and left T.H.'s house with S.M.

---

[3] Angel testified that he lives near S.M., has known him since the sixth grade, and thought of him as a brother.

[4] "Hit a lick" is a slang term involving robbery or stealing. *See **Winfrey v. State***, 393 S.W.3d 763, 778 n.16 (P.J. Keller, dissenting) (Tex. Crim. App. 2013); *see also* URBAN DICTIONARY, *Hit a Lick*, *available at* www.urbandictionary.com/define.php?term=hit+a+lick (Feb. 19, 2015) ("To rob or burglarize someone or something.").

When Angel returned home, he played his new Xbox, and S.M. left, purportedly to go to the mall. Later that afternoon, S.M. returned to the Garza home, and drove Angel and his sisters to their grandparents' home at Raquel's request. He testified that S.M. left shortly after dropping them off, but returned between ten and eleven o'clock that night. According to Angel, S.M. was acting "weird" and invited him to a party. Angel declined S.M.'s invitation, explaining that he wanted to stay with his family. Angel testified that, during this exchange, S.M. asked him if they planned to stay at his grandparents' home all night. He responded, "Yeah. We're going to stay here the whole night."

Raquel, Angel's mother, left the grandparents' home at 3:00 a.m. on Christmas morning to sleep at her own house. When she arrived home, the front door was unlocked and Angel's new television was gone. Raquel called Angel, telling him, "Somebody hit a lick on our house." She testified that she automatically knew S.M. had taken the television and started sending him text messages before she called the police, telling him to "[b]ring it back now."

Originally, Raquel did not suspect that anyone other than S.M. was responsible for the burglary.[5] But once her daughter received threatening text messages from T.H. the day after Christmas, she believed that S.M. did not act alone. After getting T.H.'s number from her daughter's phone, Raquel called T.H. When T.H. answered, Raquel introduced herself and told him that she knew he and S.M. took her television. She told him that she wanted to speak to his mother to let her know what he did and that she wanted the television returned or she would press charges. Raquel testified that T.H. then told her, "Lady, I didn't steal the TV. I don't know what you guys are talking about. You guys are trying to set us up. Y'all hacked into the Facebook. Y'all hacked into the phone." Raquel responded to T.H.'s accusations by stating, "No. . . . I have those messages[.] I'm going to give them to the police unless you guys give me back the TV. All I want is my TV."

The messages to which Raquel referred were discovered on Christmas day when Angel turned on the cell phone he found in S.M.'s truck. When the phone turned on, T.H.'s Facebook account was "already logged in." Before logging out of T.H.'s account, Angel accessed T.H.'s Facebook messages. Among those messages was a conversation T.H. had with S.M. on Christmas Eve in which they discussed stealing a television and Xbox. Angel's sister took a photograph of the

---

[5] Raquel testified that S.M. helped her unload groceries that afternoon and knew she left the front door unlocked for her children to get inside the house before he drove them to their grandparents' home. Angel testified that before they left to go to his grandparents' home, S.M. said he needed to use the restroom. Angel testified further that he believed S.M. unlocked the door when he went inside to use the restroom.

4

Facebook conversation, and the photograph was introduced and admitted at trial. Angel testified, and the photograph confirms, that S.M. and T.H. engaged in the following dialogue on Facebook:

T.H.: What you doing, man?

S.M.: Munchin.'

T.H.: Let['s] get in some s***.

S.H.: I[]kno[w] where to hit a bad a** lick, a TV and . . . Xbox.

T.H.: Let's go now.

S.H.: It's too early.

Angel testified that S.M. knew the television and Xbox had arrived at his house when S.M. told T.H. about the "bad [] lick" because the timestamp on the message showed that it was sent at 11:58 a.m. The television and Xbox were delivered to the Garza home at 11:50 a.m.

Additionally, Tyler Police Department Detective Edgar Zapata executed a search warrant on T.H.'s Facebook account. By the time he executed the search warrant, all of T.H.'s messages to S.M. had been deleted. However, Detective Zapata's search of T.H.'s account showed that T.H. sent messages to an unknown individual, "J.M.," in which T.H. related that he and S.M. were probably "going [to] bust a few mission[s] later to[n]ight."[6] In that conversation, J.M. asked what T.H. planned on doing, and T.H. responded, "Hit licks." The timestamp for these messages showed they were sent between 2:10 and 2:22 a.m., universal time coordinated (UTC), which meant the messages were sent on Christmas Eve night.[7]

Detective Zapata also discovered messages between T.H. and another individual, "G.M.," in which T.H. talked about "[h]it[ting] licks," and S.M. could be his "ride." The conversations in these messages appeared to have occurred late in the evening on December 23 and into the early morning hours of December 24. Towards the end of the conversation, G.M. told T.H. that he would be with his family for Christmas, but could be available on Thursday "or w[h]enever" to "hit licks."

---

[6] "Bust a mission" is a phrase that means "[t]o do something or perform a task. Usually it is involved with illegal activities." URBAN DICTIONARY, *Bust a Mission*, *available at* www.urbandictionary.com/define.php?term=bust+a+mission (Feb. 19, 2015).

[7] Detective Zapata testified that UTC time is "five hours ahead of us," and estimated that the messages were sent at about 11:00 p.m. "our time." The prosecutor then asked, "9:00 or 10:00 at night probably our time?" And Detective Zapata responded "I could be bad on my math, but right."

T.H. responded, "I got u but I'm still hit some of them tomorrow."  J.M. and G.M. were not identified as parties to the burglary of the Garza home, and neither testified at trial.

Finally, Raquel testified that T.H. called, asking her "to please not press charges and that they would buy me two or three TVs. . . ."

ii. *The Accomplice Evidence*

The State called S.M. as its last witness.  It is undisputed that S.M. is an accomplice because he pleaded true to burglarizing the Garza home on Christmas Eve and stealing the television.  *See Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991) (holding that an accomplice is a person who has been charged with the same offense with which the defendant has been charged).  As part of his plea bargain, S.M. agreed to testify against T.H.

During direct examination, the State asked S.M., "[T.H.] committed the burglary with you, yes or no[?]"  S.M. responded, "I can't tell you yes or no because I don't remember that day."  The State attempted to refresh S.M.'s memory with a transcript of his adjudication and disposition hearing, but S.M. maintained that he could not remember anything.

The record showed that when S.M. pleaded true to the burglary, he told the trial judge that T.H. carried the television out of the Garzas' home and placed it in S.M.'s truck.  The record also shows that Detective Zapata interviewed S.M. after he pleaded true.  The interview was recorded, and a portion of it was played before the jury.  In the interview, S.M. told Detective Zapata that he and T.H. went to the Garzas' home in his truck and "all of a sudden, [T.H.] comes running with a TV."  S.M. indicated that he expected T.H. would give him money for the television at a later date, but there is no evidence that T.H. gave S.M. anything.  In the interview, S.M. also confirms that he texted T.H. about the television and Xbox, and admitted to deleting his "Facebook" after Raquel and Angel confronted him about the burglary.

On cross examination, S.M. testified that when he pleaded true, he was "afraid" and "didn't know what to do."  He also confirmed that his interview with Detective Zapata was made as a condition of his community supervision.

**Discussion**

T.H.'s Facebook messages to G.M. and J.M. about "hit[ing] licks" and "bust[ing] a few missions" are incriminating in nature because they show T.H. was planning on committing burglaries during the Christmas holiday.  This is evidence that tends to connect T.H. to the Christmas Eve burglary of the Garza home.  *See Munoz*, 853 S.W.2d at 559.  The photograph of the Facebook messages between S.M. and T.H. connects T.H. to the burglary because S.M.'s reference

to the television and Xbox gave T.H. the motive to burglarize the Garza home—to steal the television. T.H.'s response of wanting to go "now" further shows his willingness to steal the item. Moreover, S.M. and T.H.'s Christmas Eve conversation in which they talked about "hitting licks" in front of Angel, and S.M.'s knowledge that the Garzas would not be home that night, support the inference that T.H. viewed these circumstances as an opportunity to burglarize the Garza home, presumably without getting caught. *See Gill*, 873 S.W.2d at 49.

T.H.'s Facebook messages, the Garzas' plans to spend the night away from home, the theft of the television, and T.H.'s threatening text messages and pleas to Raquel to drop the charges corroborate S.M.'s testimony that T.H. was involved in the burglary. *See id.* Additionally, T.H.'s pleas to Raquel indicate a consciousness of guilt that further connects him to the crime. *See Simmons v. State*, 282 S.W.3d 504, 510-11 (Tex. Crim. App. 2009); *Gill*, 873 S.W.3d at 49.

After eliminating all of the accomplice evidence from our consideration and examining the remaining evidence in the light most favorable to the jury's verdict, we conclude S.M.'s testimony was sufficiently corroborated to connect T.H. to the commission of the burglary. *See Smith*, 332 S.W.3d at 442; *Munoz*, 853 S.W.2d at 559. Accordingly, we overrule T.H.'s sole issue.

### DISPOSITION

Having overruled Appellant's sole issue, we ***affirm*** the judgment of the trial court.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered February 27, 2015.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

7



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**FEBRUARY 27, 2015**

**NO. 12-14-00167-CV**

**IN THE MATTER OF T. H., A JUVENILE**

Appeal from the County Court at Law No. 3
of Smith County, Texas (Tr.Ct.No. 003-0082-14)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*