

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-20-00184-CR

_____

JARED LATTA, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 424th District Court
Llano County, Texas
Trial Court No. CR7558; Honorable Evan Stubbs, Presiding

September 9, 2021

MEMORANDUM OPINION

Before PIRTLE and PARKER and DOSS, JJ.

It has been said that sometimes the biggest problems have the simplest solutions.

This case presents the reverse corollary to that proposition. Appellant, Jared Latta,

appeals from his Class A misdemeanor offense conviction, by a petit jury, of the criminal

offense of official oppression[1] and the resulting court-imposed sentence of twelve months confinement in county jail, probated for a period of eighteen months. Appellant challenges his conviction through seven issues. We will affirm.[2]

### BACKGROUND

Appellant was charged via a single-count, three-paragraph grand jury indictment with the offense of official oppression. The State proceeded to trial only on Paragraph II, abandoning Paragraphs I and III. Paragraph II of the indictment asserted that Appellant, on or about the 2nd day of May, 2017, did "then and there, knowing his conduct was unlawful, intentionally deny or impede Cory Nutt in the exercise or enjoyment of a right, namely, his right not to be deprived of his liberty without due course of law, by detaining, seizing, and arresting Cory Nutt, and the Defendant was then and there acting under color of his employment as a public servant, namely, a Llano Police Officer."

By agreement of the parties, venue was transferred to Burnet County from Llano County and the matter was tried before a jury. At trial, evidence was presented to show that Nutt was arrested from his RV park residence, without a warrant, for the Class C misdemeanor offense of public intoxication.[3] An officer is authorized under article

---

[1] TEX. PENAL CODE ANN. § 39.03(a)(2) (West 2020). A public servant acting under color of his office or employment commits an offense if he intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity, knowing his conduct is unlawful. An offense under this section is a Class A misdemeanor.

[2] Originally appealed to the Third Court of Appeals, sitting in Austin, this appeal was transferred to this court by the Texas Supreme Court pursuant to its docket equalization efforts. TEX. GOV'T CODE ANN. § 73.001 (West 2013). Should a conflict exist between precedent of the Third Court of Appeals and this court on any relevant issue, this appeal will be decided in accordance with the precedent of the transferor court. TEX. R. APP. P. 41.3.

[3] A person commits the crime of public intoxication if he or she appears in a public place while intoxicated to the degree that the person may endanger the person or another. TEX. PENAL CODE ANN. § 49.02 (West 2020).

14.01(b) of the Code of Criminal Procedure to arrest a person for public intoxication without a warrant if the offense was committed in his presence or within his view. TEX. CODE CRIM. PROC. ANN. art. 14.01(b) (West 2015). A public place includes any place to which the public or a substantial group of the public has access. TEX. PENAL CODE ANN. § 1.07(40) (West 2020).

Evidence presented at trial showed that on the day of his arrest, Nutt returned from work, grilled dinner, and ate with his next-door neighbor, Alex Britton. Nutt and Britton drank a few beers after which Nutt went back to his trailer. Shortly thereafter, Nutt walked back to Britton's trailer to look for his cell phone. As the two men were talking at Britton's door, they heard an engine rev and tires spin out on the gravel road. The men saw their neighbor from several spaces down, Grant Harden, driving his pickup through the RV park. Nutt and Britton knew Harden was a Llano police officer. Nutt told Harden to slow down. Harden stopped and backed up, and he and Nutt engaged in a heated exchange through Harden's open vehicle window. Nutt continued talking with Britton. Harden said he would "be back later," got on his phone, and left. Harden called a Llano County dispatcher and asked her to run Nutt's license plate. At trial, the dispatcher testified she heard someone yelling and cussing in the background during that call.

According to Nutt's testimony, after the dispute with Harden, he went back to his trailer, found his phone, cleaned up his dishes, called his wife about 9:40, and then went to sleep in his clothes. He did not have shoes on. Harden later returned to the RV park and called the dispatcher for Nutt's license information. At 11:09 p.m., Harden called out over the police radio, asking Appellant or another officer to respond to the RV park. Harden said he had a "public intox." Approximately one minute later, the dispatcher called

3

Harden and asked if he was "out with this Cory subject." Harden responded, "He's intoxicated and he went back in his RV, I'm going to sit here for another unit."[4] When the dispatcher asked for clarification on the identity of the subject, Harden said, "first name Cory is all that I know."

Appellant, Officer Aimee Shannon, and Llano Police Chief Kevin Ratliff responded to the RV park. The four police officers knocked on Nutt's door and he answered, wearing clothes and socks but no shoes. Officer Shannon's body camera recorded approximately the final fourteen minutes of the confrontation between Nutt and the other officers.[5] Harden and Nutt argued about the circumstances of their earlier confrontation with Harden saying he saw Nutt intoxicated outside his trailer and had informed Nutt he was under arrest for public intoxication. Nutt disagreed, saying that never happened and that he was inside asleep when the officers arrived. Nutt testified he woke to the sound of loud knocking or beating on his trailer door. He opened the door and an officer pulled the door from his grasp and latched it open.[6] Nutt stood at the doorway of his trailer, refused to exit the trailer, and denied consent for the officers to enter.

According to the transcript and audio of the confrontation between the officers and Nutt, Harden said Nutt went inside his trailer and shut the door. He further said, Nutt "ran inside [the trailer] and slammed the door, but he's so intoxicated he couldn't even lock it." When the officer confronted Nutt at his trailer door, Harden made several statements

---

[4] Harden claimed he had detained Nutt for public intoxication before he went into his trailer. However, there was nothing in the evidence to suggest Harden's alleged attempt to detain Nutt or that Nutt had evaded any detention by going into his trailer.

[5] The recording from the body camera provides a limited view of the interaction.

[6] Nutt testified that the door to his RV opened outward.

indicating that Nutt's failure to comply with the demands could cost him his job and Officer Shannon claimed Nutt's failure to comply might lead to additional charges. After an intense exchange, Nutt provided to Officer Shannon his identification when she requested it.

At approximately ten and a half minutes into the recorded portion of the interaction between Nutt and the three officers, Officer Shannon can be seen pointing a taser at Nutt. Nutt remained inside the doorway of his trailer and Officers Shannon and Harden told him he would be tased if he did not comply with their demands. Chief Ratliff walked past the other two officers, moved behind Nutt, put a hand on Nutt's back, instructed him to step out of the trailer, and directed him out the door and down the steps. Nutt characterized this as "pushing" him, but not forcefully. Nutt stated, "I don't want to walk outside" to which Appellant replied, "You're not—come on out, or . . . you're not going to like the way I do it." Once Nutt was outside, Appellant handcuffed him. While Nutt requested that he be handcuffed in front of his body, Appellant refused, telling him that he "lost that opportunity earlier" when he "didn't do what we asked." Nutt was then transported to the jail.[7] One witness, an attorney for the Law Enforcement Defense Division of the Attorney General's office, testified Appellant appeared to use a pain compliance technique on Nutt while handcuffing him. Another witness characterized Nutt's arrest as unlawful because he was arrested for public intoxication out of his residence without a warrant in violation of

---

[7] The interim police chief investigated the interaction between Nutt and the officers. As part of that investigation, he interviewed Nutt. He said that when he spoke with Nutt in March 2018, Nutt was "cooperative, sober, and fairly articulate. On the night of 5/2/17, Mr. Nutt appeared on video/audio to be very intoxicated."

5

applicable law. The public intoxication charge filed against Nutt was subsequently dismissed.

**ANALYSIS**

**ISSUE ONE—TWELVE PERSON JURY**

Through his first issue, Appellant contends the trial court erred in forming, seating, and swearing in a twelve-person jury in violation of article V, section 13 of the Texas Constitution and article 33.01(b) of the Texas Code of Criminal Procedure. The State responds that Appellant has waived this issue for appellate review because he did not object to the jury as seated. Further, the State argues, even assuming error, Appellant was not harmed because by increasing the size of the jury to twelve, the trial court afforded Appellant procedural protections exceeding those required by the Texas Constitution. And, since the effect of seating twelve jurors was to significantly increase the State's burden, it did not affect Appellant's substantial rights and did not contribute to his conviction.

Article 4.05 of the Texas Code of Criminal Procedure provides that district courts have original jurisdiction in criminal cases of all misdemeanors involving official misconduct. TEX. CODE CRIM. PROC. ANN. art. 4.05 (West 2015). Article V, section 13 of the Texas Constitution provides, "Grand and petit juries in the District Courts shall be composed of twelve persons, except that petit juries in a criminal case below the grade of felony shall be composed of six persons[.]" TEX. CONST. art. V, § 13.

Article 33.01 of the Texas Code of Criminal Procedure provides as follows:

(a) Except as provided by Subsection (b), in the district court, the jury shall consist of twelve qualified jurors.  In the county court and inferior courts, the jury shall consist of six qualified jurors.

(b) In a trial involving a misdemeanor offense, a district court jury shall consist of six qualified jurors.

TEX. CODE CRIM. PROC. ANN. art. 33.01 (West 2006).

Prior to *voir dire*, the court and the parties discussed jury formation.  The following discussion took place on the record:

Defense:    Just so for the record, it's my understanding that the court's position is that we are seating 12 jurors, and each side gets five strikes? Is that –

The Court:  From – from my reading of it that appears to be proper, although that's not what I would have thought when you asked me last week before I looked at the Code, but it's my understanding that there's a provision that basically says that the clerk is to seat the first 12 jurors in district court that have not been stricken through [peremptory] strikes, so, therefore, I believe the number would be 12, and there's a separate provision that states that for a misdemeanor offense heard in district court that each side receives five [peremptory] strikes.

Defense:    And, just for the purpose of the record, it's the defense's understanding and position that a misdemeanor tried in district court is a formation of six jurors with strikes of five each side. I understand the court's ruling. I've just – if the court is seating 12, we would request ten strikes.

The Court:  Okay. Well, my – my – as I said off the record, if you have a provision that you can point me to, I would be more than happy to make the jury either a jury of six or to provide you with ten strikes; however, my reading of the Code is that it's a 12-person jury with five strikes. State, do you have a position?

7

Prosecutor: I'd like ten strikes as well, but I think the court is right. It says – 35.26(a)[8] says that the district clerk will strike [sic] the first 12 jurors after strikes in a district court. 35.15 says that there are five challenges for a misdemeanor in district court. So that's –

Defense: I object, Your Honor, on the record, just for safety sakes.

The Court: Just so it's clear, the objection is overruled.

Defense: Yes, sir.

The Court: It will be a 12-person jury and each side will receive five [peremptory] strikes.

Defense: Yes, sir.

After this exchange, the parties conducted *voir dire*, exercised their challenges, both challenges for cause and peremptory challenges, and a twelve-person jury was seated. When asked whether there was any objection "to this jury," defense counsel responded, "No, Your Honor."

The State agrees with Appellant that, despite some confusion in Texas statutes and the apparent reliance by the trial court on one of those, article 35.26(a), the Texas Constitution requires that district court juries in misdemeanor cases be composed of six jurors, and the constitutional provision controls over the conflicting statutes. Therefore, to the extent that the trial court seated twelve jurors instead of six, the trial court erred.

---

[8] Article 35.26(a) of the Texas Code of Criminal Procedure states as follows:

When the parties have made or declined to make their peremptory challenges, they shall deliver their lists to the clerk. Except as provided by Subsection (b) of this section [dealing with the seating of alternate jurors in death penalty cases], the clerk shall, if the case be in the district court, call off the first twelve names on the lists that have not been stricken. If the case be in the county court, he shall call off the first six names on the lists that have not been stricken. Those whose names are called shall be the jury.

TEX. CODE CRIM. PROC. ANN. art. 35.26(a) (West 2005).

8

However, the State contends, any error in the seating of extra jurors was harmless. Appellant does not discuss harm in his appellate brief. He says the error seating the jury violated his constitutional rights and thus, "the error is not one that is subject to a harm analysis . . . ." We disagree.

All errors are subject to harm analysis except for the very limited class of constitutional errors characterized as "structural" errors. *Lake v. State*, 532 S.W.3d 408, 411 (Tex. Crim. App. 2017) (citation omitted). The error before us is not structural in nature. The United States Constitution does not require misdemeanor juries to consist of no more than six persons. Rather, it requires only an impartial jury. U.S. CONST. amend. VI.[9]  *See McClellan v. State*, 143 S.W.3d 395, 400 (Tex. App.—Austin 2004, no pet.) (citations omitted).

Pursuant to Rule 44.2(a), "[i]f the appellate record in a criminal case reveals *constitutional* error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction." TEX. R. APP. P. 44.2(a) (emphasis added). Pursuant to rule 44.2(b), "Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). A substantial right is affected if the error had a substantial and injurious effect or

---

[9] The Sixth Amendment provides as follows:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

U.S. CONST. amend. VI.

influence in determining the jury's verdict. *Barshaw v. State*, 342 S.W.3d 91, 93-94 (Tex. Crim. App. 2011); *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005). If the error did not influence the jury or had but a slight effect, the error is harmless. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

An appellate court should examine the record as a whole when conducting a harm analysis. *Motilla v. State*, 78 S.W.3d 357, 358 (Tex. Crim. App. 2002). In conducting the harm analysis, an appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the trial court's instructions to the jury, the State's theory, any defensive theories, closing arguments, and even *voir dire*, if material to the appellant's claim. *Motilla*, 78 S.W.3d at 355-56; *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). In assessing harm, the factors to be considered are the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with the other evidence in the case. *Motilla*, 78 S.W.3d at 355; *Morales*, 32 S.W.3d at 867. Also, an appellate court should consider overwhelming evidence of guilt, but it is only one factor in the harm analysis. *Motilla*, 78 S.W.3d at 357.

We do not find any evidence Appellant was harmed under the standards set forth in either 44.2(a) (constitutional error) or (b) (non-constitutional error).[10] As noted, the United State Constitution does not speak to the size of juries. The Texas Constitution

---

[10] The State argues that while the Texas Constitution is the basis for the complaint herein, the error here does not rise to the level of constitutional error. We do not find it necessary to determine which harm analysis is applicable here as no harm is shown under either.

clearly requires that a six-person jury be seated in misdemeanor cases heard in district court. A twelve-person jury was seated in Appellant's case despite this provision. While error, we cannot find harm. Larger sized juries tend to produce longer deliberations, more communication, better community representation and hopefully, greater verdict reliability. *Ballew v. Georgia*, 435 U.S. 223, 245, 98 S. Ct. 1029, 55 L. Ed. 2d 234 (1978). Further, the fact that a twelve-person jury was seated in Appellant's case placed a higher burden on the State as it was required to convince twelve, rather than just six, people of Appellant's guilt. *Compare McClellan,* 143 S.W.3d at 401 (finding the trial court lessened the State's burden to prove appellant guilty beyond a reasonable doubt when it proceeded with eleven jurors instead of twelve). The larger jury provided Appellant with more safeguards than those required by the constitution, not less. Accordingly, we do not find Appellant was harmed by the trial court's seating of a twelve-person jury and we overrule Appellant's first issue.

### ISSUE TWO—CHALLENGES

Via his second issue, Appellant argues the trial court erred in limiting the number of peremptory strikes afforded to each side in violation of section 35.15(b) of the Texas Code of Criminal Procedure.

That provision provides in relevant part:

(b) In non-capital felony cases and in capital cases in which the State does not seek the death penalty, the State and defendant shall each be entitled to ten peremptory challenges. If two or more defendants are tried together each defendant shall be entitled to six peremptory challenges and the State to six for each defendant.

(c) The State and the defendant shall each be entitled to five peremptory challenges in a misdemeanor tried in the district court and to three in the

county court, or county court at law. If two or more defendants are tried together, each defendant shall be entitled to three such challenges and the State to three for each defendant in either court.

TEX. CODE CRIM. PROC. ANN. art. 35.15(b), (c).

The trial court allowed each side five peremptory challenges, precisely following the mandate set forth in section (c) of the above-quoted provision for a misdemeanor tried in district court. While the judge did seat a twelve-person jury, the above-quoted provision speaks only to the number of challenges in felony cases and misdemeanor cases and not to whether the challenges differ based on the number of jurors seated. As such, we find the trial court did not err in limiting the number of peremptory strikes allowed to each side. We overrule Appellant's second issue.

### ISSUE THREE—LIMITATION DURING VOIR DIRE

By his third issue, Appellant asserts the trial court abused its discretion in limiting defense counsel's questioning of the venire panel during *voir dire*. He notes that the State's *voir dire* encompassed nearly forty pages of the reporter's record and there were no interruptions during that time. He points out his counsel prepared a digital slideshow to use during *voir dire* and that his examination encompassed nearly forty-six pages of the reporter's record and covered numerous topics. When counsel began discussing the concept of Fifth Amendment protections, the trial court interrupted and informed counsel that he was "out of time." Counsel requested additional time, arguing he had not been able to cover all of the issues he deemed important for *voir dire*. The court informed counsel he had been afforded the same length of time as the State and that he had been informed of the length of time before *voir dire* started. As a result, the court denied Appellant's request for additional time. Appellant submitted a thumb drive of the

12

information he was unable to cover with the jury panel, including the Fifth Amendment, burden of proof related to defenses, and unanimous verdict.  The slides included six questions counsel would have asked the jury.

On appeal, Appellant argues the trial court erroneously limited his *voir dire* and prevented him from questioning the panel on several very significant subjects.  He argues this error was compounded by the trial court's error in seating a twelve-person jury and allowing only five peremptory challenges because this added to his inability to properly vet all jurors.  As a result, Appellant contends, "[i]t is not possible to review such a situation and find beyond a reasonable doubt that the error did not contribute to his conviction."

Texas trial courts have broad discretion over the jury-selection process.  *Barajas v. State,* 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).  The trial court's right to "dispatch its business expeditiously must be justly balanced against society's interest in seating fair juries."  *Whappler v. State*, 183 S.W.3d 765, 773 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (citing *McCarter v. State*, 837 S.W.2d 117, 120 (Tex. Crim. App. 1992)).  Accordingly, we review complaints about restrictions on *voir dire* for abuse of discretion.  *Whappler*, 183 S.W.3d at 773; *Barajas*, 93 S.W.3d at 38.  Absent an abuse of discretion, we will not reverse the trial court's refusal to allow defense counsel additional *voir dire* time.  *Whappler*, 183 S.W.3d at 773 (citing *McCarter*, 837 S.W.2d at 119; *Smiley v. State*, 129 S.W.3d 690, 696 (Tex. App.—Houston [1st Dist.] 2004, no pet.)).

Courts have described the purposes of *voir dire* as (1) to develop rapport between the officers of the court and the jurors; (2) to expose juror bias or interest warranting a challenge for cause; and (3) to elicit information necessary to intelligently use peremptory

13

challenges. *Cordova v. State*, 296 S.W.3d 302, 307 (Tex. App.—Amarillo 2009, pet. ref'd) (citing *Dhillon v. State*, 138 S.W.3d 583, 587-88 (Tex. App.—Houston [14th Dist.] 2004, pet. stricken); *S.D.G. v. State*, 936 S.W.2d 371, 380 (Tex. App.—Houston [14th Dist.] 1996, pet. denied)). A trial court may impose reasonable restrictions on the exercise of *voir dire* examination, including reasonable limits on the amount of time each party can question the jury panel. *Caldwell v. State*, 818 S.W.2d 790, 793 (Tex. Crim. App.1991), *overruled on other grounds, Castillo v. State*, 913 S.W.2d 529 (Tex. Crim. App.1995); *Ratliff v. State*, 690 S.W.2d 597, 597 (Tex. Crim. App.1985).

When a party complains of an inability to collectively question the venire, a two-part test applies: (1) whether the complaining party attempted to prolong the *voir dire*; and (2) whether the questions the party was not permitted to ask were proper *voir dire* questions. *Cordova*, 296 S.W.3d at 307 (citing *McCarter*, 837 S.W.2d at 120; *S.D.G.*, 936 S.W.2d at 380). To preserve error concerning the manner of *voir dire*, an appellant must point to a question the trial court did not allow the panel to answer. *Id.* (citations omitted).

The resolution of Appellant's issue in this situation turns on whether he preserved error. We conclude he did not. The record reflects that after Appellant's request for additional time was denied, Appellant asked the court if the "thumb drive with the remaining slides—well, with all of the slides and the remaining slides starting with the slide covering the Fifth Amendment, failure to testify that was not covered and beyond be admitted in support of my request for additional time." Counsel agreed he was offering the thumb drive as an exhibit "[a]s a bill of proof in support of my request." The court permitted the admission for the purpose of the record. Counsel asked if the trial court

14

would prefer to have a hard copy of the slides and the court said it would. Counsel then told the court he would "submit that later in the day" when he obtained hard copies. Nothing further was offered in support of Appellant's bill of proof.

Appellant's identification of slides covering "the Fifth Amendment, failure to testify that was not covered and beyond" did not timely advise the trial court of the specific questions he desired to ask the panel. Furthermore, it is unclear when the hard copies were submitted to the trial court and when, if ever, the court reviewed that exhibit in its digital or paper form. To preserve error, it was Appellant's burden to inform the trial court of specific questions he was not permitted to ask at a time at which the court could rectify any error. *Dhillon*, 138 S.W.3d at 591; TEX. R. APP. P. 33.1(a)). To perfect his bill of proof, counsel should have read each of the desired questions into the record before the court but, did not do so. A general reference to the subject matter of the inquiry or where the questions might be found is insufficient to preserve error.

Further, even assuming preservation of error, we note that "[c]ounsel has the responsibility to appropriately budget his time within the reasonable limits set by the court." *Whitaker v. State*, 653 S.W.2d 781, 781-82 (Tex. Crim. App. 1983). As noted, both the State and defense counsel were told before *voir dire* how much time each side would have to examine and question the panel. Both sides were afforded the same length of time. Counsel did not request additional time, nor did he complain that the time permitted was insufficient. Further, counsel was warned when he had five minutes remaining of his time for *voir dire* and he did not at that time voice a complaint or change the cadence of his examination. He simply said, "Judge, I know I'm going to go over." To

which the court responded, "No, you're not." In response, counsel simply told the court that if his time was up, he wanted to submit his thumb drive to the court.

The record shows counsel used a significant portion of his allotted *voir dire* time introducing himself, asking each individual venire member to rank his or her perception of Appellant's guilt and discussing the origins of the United States and Texas Constitutions. While each of these subject areas was arguably important and utilized strategically by counsel, the trial court would not have abused its discretion in determining that counsel could have better used his allotted time to examine the venire members on all of the areas he had identified as significant in this case, rather than spending such a considerable amount of time on areas that were not as beneficial to selecting the best jury for this specific case. This is particularly true given the fact that the court had explicitly warned counsel that they would not be allowed to go over their allotted time. *See Godine v. State,* 874 S.W.2d 197, 202 (Tex. App.—Houston [14th Dist.] 1994, no pet.) (finding trial court would not have abused its discretion to find that counsel unnecessarily prolonged his *voir dire* and wasted time that could have been used in another manner). Accordingly, we overrule Appellant's third issue.

### ISSUE FOUR—ACCOMPLICE WITNESS TESTIMONY INSTRUCTION

In his fourth issue, Appellant complains that the trial court committed egregious error by failing to instruct the jury as to the effect of accomplice witness testimony. Appellant argues that because Officer Shannon "was under indictment for the same offense for which Appellant was indicted, Shannon was an accomplice witness as a matter of law." Accordingly, he argues the trial court should have provided the instruction to the jury and because it did not, it committed harmful reversible error.

16

An accomplice is one "who participates with a defendant before, during, or after the commission of the crime and acts with the requisite culpable mental state." *Martin v. State*, No. 07-15-00079-CR, 2017 Tex. App. LEXIS 2265, at *5-6 (Tex. App.—Amarillo Mar. 15, 2017, pet. ref'd) (mem. op., not designated for publication) (citing *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006)). To be considered an accomplice, the witness must have affirmatively acted to promote the commission of the offense with which the defendant is charged. *Martin*, 2017 Tex. App. LEXIS 2265, at *6 (citing *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011)).

In Texas, a "conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed[.]" TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2020); *Zamora v. State*, 411 S.W.3d 504, 509 (Tex. Crim. App. 2013) (quoting *Druery v State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007)). Specifically, article 38.14 of the Texas Code of Criminal Procedure provides as follows:

> A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

This rule reflects a legislative determination that accomplice witness testimony implicating another person should be viewed with a measure of caution because accomplices often have a personal incentive to shift the blame to another person. *Martin*, 2017 Tex. App. LEXIS 2265, at *6 (citing *Zamora*, 411 S.W.3d at 509). Therefore, where implicated by the facts of a given case, because the rule requires the testimony of an accomplice to be corroborated before a conviction can stand on that testimony, jury

instructions must include a proper definition of an accomplice. *Martin,* 2017 Tex. App. LEXIS 2265, at *6 (citing *Zamora*, 411 S.W.3d at 510). However, the non-accomplice testimony does not need to establish every element of the crime. *Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007).

In addition, the particular accomplice witness instruction that must be given to the jury depends on whether the witness is an accomplice as a matter of law or as a matter of fact. *Martin*, 2017 Tex. App. LEXIS 2265, at *7. This is a matter determined according to the circumstances of each case and "[a] proper accomplice-witness instruction informs the jury either that a witness is an accomplice as a matter of law or that he is an accomplice as a matter of fact." *Id* (citations omitted). A witness is an accomplice as a matter of law if he or she has been charged with the offense in question, or a lesser-included offense. *Martin*, 2017 Tex. App. LEXIS 2265, at *7 (citing *Zamora*, 411 S.W.3d at 510; *Druery*, 225 S.W.3d at 498). If a witness is an accomplice as a matter of law, the trial court is required to affirmatively instruct the jury that the witness is an accomplice and that his or her testimony requires corroboration. *Martin*, 2017 Tex. App. LEXIS 2265, at *7 (citing *Zamora*, 411 S.W.3d at 510).

Here, Appellant did not object to the absence of an accomplice witness instruction and thus, any error will not require reversal unless Appellant shows he has been egregiously harmed. *Herron v. State*, 86 S.W.2d 621, 632 (Tex. Crim. App. 2002). Under the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (i.e., non-accomplice) evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Id.* (citation omitted). In examining the record for egregious

18

harm, a reviewing court should consider the entire jury charge, the state of the evidence, including the contested issues and the weight of the probative evidence, the final arguments of the parties, and any other relevant information revealed by the record of the trial as a whole. *State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016); *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008) (citation omitted). Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Ambrose*, 487 S.W.3d at 597 (citation omitted).

At the time Officer Shannon testified, she had been indicted for the same offense as Appellant, i.e., official oppression, arising out of the same events at issue in this case. Therefore, it is undisputed that she was an accomplice as a matter of law. *Ash v. State*, 533 S.W.3d 878, 884 (Tex. Crim. App. 2017) (stating "[i]f the witness has been charged with the same offense as the defendant or a lesser-included offense, then the witness is an accomplice as a matter of law"). As such, the trial court should have instructed the jury that Officer Shannon was an accomplice and that her testimony must be corroborated before it could be considered by the jury. *Cocke*, 201 S.W.3d at 748 (citation omitted); *Torres v. State*, 560 S.W.3d 366, 371 (Tex. App.—San Antonio 2018, no pet.). Because it did not include such an instruction, the trial court erred. As such, we must now turn to a consideration of the amount of harm caused by this error.

Appellant argues he was egregiously harmed by the trial court's failure to include an instruction concerning accomplice witness testimony in the charge to the jury. He contends the State's insistence on the inclusion of a law of parties instruction, the State's emphasis on conviction as a party in its closing arguments, and its reliance on Officer

Shannon's testimony in arguing the law of parties supports his assertion that he was egregiously harmed by the trial court's omission. The State disagrees, arguing the error was harmless because the record contains ample non-accomplice testimony that tended to connect Appellant to the offense, therefore allowing the jury to consider Officer Shannon's testimony the same as it would any other evidence.

We agree with Appellant that the State both referred to and emphasized Officer Shannon's testimony. Furthermore, we agree the remainder of the jury charge failed to indicate corroboration was required. Those factors weigh in favor of a finding of egregious harm. However, in light of the strength of the non-accomplice testimony presented, we cannot find Appellant was egregiously harmed by the omission of the accomplice witness instruction.

The non-accomplice testimony presented at trial included the testimony of Nutt, Britton, and Christie Schutte. Each of these witnesses provided information that tended to connect Appellant to the offense with which he was charged, and that evidence was not so exceedingly weak that he was deprived of a fair and impartial trial. *See State v. Ambrose*, 457 S.W.3d 154, 160 (Tex. App.—San Antonio 2015), *aff'd*, 487 S.W.3d 587 (Tex. Crim. App. 2016). Each of the non-accomplice witnesses testified that Appellant participated in removing Nutt from his trailer and in Nutt's arrest. This evidence was both uncontradicted and relatively strong.

20

Nutt testified that in May 2017, he was living at the RV park while his company was rebuilding electrical stations in San Saba. He had lived there for about a year[11] and he and his next-door neighbor, Britton, often socialized. He also said he knew Officer Harden was a police officer who lived in a recreational vehicle at the end of the row in the RV park where he lived.[12] On the evening in question, he and Britton cooked dinner on the barbeque pit between their residences. The two men had drinks with dinner.[13] Nutt testified he "had a few beers" and drank from about 6:30 to 9:30 that evening.[14] They spent a couple of hours together, but Britton was on call for his job and was in and out a bit during the evening. Nutt testified that after the two finished dinner, Nutt was cleaning up. He had misplaced his phone, so he went to Britton's RV to see if he had left it there. He said it was about 9:15 in the evening and was getting dark when he heard Officer Harden's vehicle spin out and round the corner. He yelled "hey" at Officer Harden and asked him to slow down. Nutt testified he thought Officer Harden should slow down because there was a lot of traffic in the park in the evenings and it was difficult to see. He said there were elderly people who walk their animals and kids that play in the RV park. He said his six-year-old son stayed with him quite a bit on the weekends. Officer Harden took offense at Nutt's comments, stopped his vehicle, and rolled down his window, and Nutt again told him he was driving too fast. Nutt admitted he spoke loudly because he

---

[11] Nutt testified he did not live there all the time. He was living there while completing this project, but he had a home with his family elsewhere.

[12] Nutt testified he did not know Officer Harden's name at the time of the incident.

[13] During cross-examination, Nutt testified he did not think Britton was drinking because he was on call.

[14] During cross-examination, Nutt said he did not recall how many beers he drank but agreed it was less than six.

was about twenty-five feet away. Nutt said the conversation was "a little bit heated, but not to the point I would have been screaming." Nutt said Officer Harden told him "he is the law" and said he was not speeding. Nutt turned back to Britton to continue asking about his phone. Officer Harden appeared to get on his phone and then drive away. Following the exchange, Nutt went back to his RV, found his phone, finished cleaning the dishes, called his wife around 9:40, and went to bed.

About an hour and a half later, he heard very loud knocking at his door. He partially opened the door and saw two officers, one of whom was Officer Shannon and one of whom Nutt was unable to identify. The two officers told him to come out of his trailer. One of the officers grabbed the door and latched it open on the outside. Nutt said the officers kept telling him to step out of his trailer because he had been witnessed as being intoxicated in his yard. Nutt said that he had not been out of his RV since having returned from Britton's RV where he went to look for his phone and that he had gone to sleep after he spoke with his wife at 9:40. Nutt said the officers "made it very clear they wanted me outside." Nutt did not know the officers, but he heard Officer Harden at the back of the trailer talking to who Nutt presumed to be another officer, telling his side of the story.[15]

Nutt testified all of the officers kept asking him to step outside the trailer and did so for around ten minutes. He said he believed "the intent of four officers to show back up to my house an hour and a half after me and Grant Harden had a conversation" was to arrest him. Nutt said that he did not give any of the officers consent to enter his RV and

_____

[15] Nutt testified he believed Harden's side of the story to be that Nutt "was out in [his] yard hollering obscenities at him, stumbling around intoxicated, and that I was drunk in public." Nutt denied this story, stating he was asleep in his RV.

that he told them they were not welcome and to leave his property. Officer Harden threatened to "come up and get" Nutt. Officer Shannon pointed a taser at Nutt and Officer Harden repeatedly said, "She's going to tase you, dude." Appellant was also there and was positively identified by Nutt at trial.[16]

Eventually, Chief Ratliff came into his trailer to get him. Chief Ratliff walked into Nutt's trailer, put his hands on the small of his back, and pushed him out of the RV. Nutt testified he did not want to go outside but that Chief Ratliff forced him out by pushing him. Nutt did admit that while he did not want to go, he did comply. Nutt said that "[a]s soon as my feet touched the ground I was placed under arrest and the cuffs were put on me." Nutt did not know who placed the cuffs on him because he was facing away from the officer. He testified it was "very uncomfortable" when he was cuffed and that despite asking to be cuffed in front since he is a "bigger fellow," the officer did not do so. Nutt was told he "had lost all [his] rights to reasonably asking for anything by not stepping out of [his] trailer when they requested [him] to." Officer Shannon loosened Nutt's handcuffs and placed him in the back of a patrol car. He was booked into jail and was released about 8:00 or 8:15 the next morning. He was charged with public intoxication; however, that charge was later dismissed.

Britton's testimony also tended to connect Appellant to the charged offense. Britton testified he lived next to Nutt at the RV park. He said the two were friends and "hung out quite a bit . . . cooked dinner quite a bit." At about 7:00 in the evening of the day in question, Britton and Nutt were cooking outside Britton's RV. The two men ate

---

[16] Nutt did not recall Appellant saying anything directly to him the night of the incident.

dinner and had a few drinks together.[17]  Britton testified Nutt had "a beer and maybe two mixed drinks."  Around 8:00 or 8:30, the two parted ways and they went inside their respective RVs to get ready for bed.  At about 9:00,[18] Nutt came back to Britton's RV looking for his phone.  While the men were outside Britton's door talking, they saw Officer Harden leaving in his truck.  Britton testified he knew who Officer Harden was and that he was a police officer.  Britton testified Officer Harden "seemed like he was in a hurry."  Britton told the jury that Nutt told Officer Harden to slow down.  In response, Harden stopped and rolled his window down, saying he was on his way to a call and asked what Nutt had said.  Britton characterized the conversation as "a little heated, but it was pretty quick also."  At the time of the exchange, Nutt was about five steps from Britton's RV door and about twenty or thirty feet away from Officer Harden's truck.  Britton also said Nutt was speaking clearly, not staggering and did not look intoxicated or like he was a danger to himself or others.  Britton testified Officer Harden said he "would be back later to handle this," then he left.  At that time, Nutt and Britton went back to their own RVs.

Britton testified that later that night, after he had gone to bed but before he was asleep, he heard hard knocking on the door to Nutt's RV.  When it was repeated, he got up to see what was going on.  He saw "three or four" police officers, two in front of Nutt's door, Officers Harden and Shannon, and two, Appellant and Chief Ratliff, standing behind

---

[17] At the time of the incident, Britton was twenty years old and thus, under the legal drinking age. He testified his parents had brought beer to him the previous weekend.

[18] On cross-examination, Britton admitted it could have been an hour later.  He later acknowledged he was simply estimating or guessing at the time.

those officers.[19]  He saw Officers Harden and Shannon talking to Nutt while he was standing at his open RV door.  The officers were asking Nutt to come out of the RV because "they said that he was intoxicated, and he needed to come out."

Britton testified he also knew Schutte because she was "running the RV park."  On the night Nutt was arrested, Schutte was in her truck right next to where Britton was standing.  Schutte testified she was the manager at the RV park where the events in question occurred.  She told the jury she knew the officers before the incident that night.  While she did not know Appellant personally, she knew him as an officer in town.  She testified Officer Harden called her just before 11:00 that night and told her there was "a disturbance in the park a couple trailers down from him."  When she arrived, she pulled her vehicle near Officer Harden's vehicle.  She saw him behind Britton's trailer, speaking on the phone and his radio about Nutt's license plate.  When she spoke with Officer Harden, he told her he was taking Nutt to jail for public intoxication.  Schutte called the owner of the RV park to let her know what was happening and stayed on the phone with her during the entire incident, spanning forty-four minutes.  Schutte pulled her vehicle into a position that allowed her to see Nutt and his trailer.  She testified she was about fifteen feet from Nutt's door.

Schutte testified that she saw Appellant arrive after she moved to where she could see Nutt's door.  She saw him with Officer Harden in Nutt's yard.  Officer Shannon and Chief Ratliff arrived shortly thereafter.  Schutte said "[Nutt] was in his door.  [Officer

---

[19] Britton only knew Officer Harden at the time of Nutt's arrest.  He learned the identities of the other officers through the investigation and trials of the officers.  At one of the prior trials, Britton answered "I'm not sure" when asked whether Appellant was there at the time.  Britton identified Appellant at Appellant's trial as one of the officers at Nutt's trailer that night.

Harden] was holding the door. And then there was [Officer Shannon], [Appellant], and then [Chief Ratliff] was right behind [Officer Shannon's] shoulder in between him and [Appellant]." She testified Appellant and Officer Shannon were "shoulder-to-shoulder almost lined up there." Schutte testified she saw the officers talking to Nutt, trying to get him to come out of the RV "for a good while . . . [a]t least 20 minutes I think." She said the confrontation ended when Chief Ratliff went into Nutt's trailer and pushed him out the door. Schutte testified that it was Appellant who handcuffed Nutt.

The record shows the State also introduced Appellant's training records that showed he held an *Advanced Peace Officer Certificate* and had taken both a "new supervisor" course and an "intermediate arrest, search and seizure" course.

The above-noted non-accomplice witness testimony, coupled with the evidence of Appellant's training, showed that Appellant was aware that the officers' attempts to remove Nutt from his trailer and arrest him without a warrant were unlawful. Thus, that evidence tended to connect Appellant to the offense.

Further, the State offered the expert testimony of Karen Matlock. She testified the officers' conduct, including that of Appellant, was evidence of their knowledge that their actions were unlawful under the circumstances. She pointed out that the officers remained outside Nutt's trailer for "quite some time" because "[t]hey know they can't go in there. They know it's a PI. They know they don't have the authority to go in there without a warrant, otherwise they would have gone in earlier. They know no one else in in trailer [sic]. So they wait and they wait and then other officers show up who decide to go ahead and go in." She concluded that, as a result of the action taken, the officers

26

deprived Nutt of his constitutional right to due process of law. She noted that public intoxication is not a jailable offense and that Nutt was found in his own home. Such an offense is not of the type of offense that exigent circumstances will allow a warrantless arrest from a person's home. Here, the officers not only attempted to remove Nutt from his home for the purpose of arrest but they also threatened him with the loss of his job as a result of his conduct. Matlock characterized this as "[t]otally inappropriate." She further said the officers had "no justification. They could not lawful [sic] arrest [Nutt], so he has not committed any offense by refusing to come out or refusing whatever they're telling him to do as far as submitting to arrest." She elaborated, stating that there was no evidence that Nutt was intoxicated, much less any evidence that he presently presented a danger to himself or others as a result of his intoxication. Thus, in her opinion, the officers' seizure and arrest of Nutt was unlawful. She further testified there was no reason for Appellant to use a painful stimulus to handcuff Nutt and using pain without justification was a violation of his civil rights and could result in an excessive use of force lawsuit. She also opined that Appellant was acting under color of law during this incident. She testified, "He was a law enforcement officer for the Llano police department, and he was acting as a law enforcement officer when he took him into custody." This non-accomplice witness testimony also tended to connect Appellant to the offense.

We also consider the state of the arguments in the record. The State first emphasized Matlock's testimony in closing arguments. It also emphasized Officer Shannon's testimony and the law of parties, stating that the State "needed Aimee Shannon and the information she had for two very important points that only she could provide." Those two things were that Officer Shannon said she turned her body camera

27

on as soon as she got out of her vehicle and that Appellant arrived at the scene "about five minutes" after she did. The defense also emphasized Officer Shannon's testimony and noted that she was given immunity so that she was able to say "whatever she wants and nothing can be held against her."

While the State believed Officer Shannon's testimony to be "very important" and the defense argued her testimony was more believable and credible due to the grant of immunity, a "proper harm analysis requires us to disregard" her testimony in determining whether Appellant suffered egregious harm. *Ambrose*, 457 S.W.3d at 162 (citing *De La Rosa v. State*, 919 S.W.2d 791, 796 (Tex. App.—San Antonio 1996, pet. ref'd) (noting that *Almanza*'s harm standard in accomplice witness cases requires a reviewing court to disregard the accomplice testimony and consider only non-accomplice corroboration)).

Based on this standard, we find the non-accomplice evidence in the record significantly connected Appellant with the offense for which he was charged. *See Herron*, 86 S.W.2d 632. We thus find the error in omitting an instruction to the jury concerning accomplice witness testimony to be harmless under the requisite egregious harm standard applicable here. As such, we overrule Appellant's fourth issue.

### ISSUE FIVE—JURY INSTRUCTIONS

By his fifth point of error, Appellant argues the trial court erred in failing to include requested jury instructions and definitions concerning the law and defenses applicable to the case. We will consider each argument separately.

28

**Texas Penal Code Section 8.02—Mistake of Fact**

"It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." TEX. PENAL CODE ANN. § 8.02(a); *Louis v. State* 393 S.W.3d 246, 253 (Tex. Crim. App. 2013). An instruction is not required if the evidence, viewed in the light most favorable to the defendant, does not establish a mistake of fact defense. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999).

Appellant argues that "[c]learly, his mistake of fact whether or not Probable Cause existed based upon the knowledge, collective knowledge of other officers and or his reliance on their formation or justification for the detention, seizure and arrest of the Complaining Witness may negate in a juror's mind, the culpability necessary for the offense, namely 'intentionally deny or impede Cory Nutt in the exercise or enjoyment of a right . . .' and thus Appellant was entitled to an instruction on mistake of fact."

The State argues the trial court did not err in refusing to include the requested instruction because it was unclear and misleading and an incorrect statement of law. Furthermore, the State contends that the requested instruction was unnecessary because it only denied the existence of an essential element of the State's case, i.e., Appellant's knowledge that his behavior was unlawful, and thus, was redundant. Lastly, the State asserts that even if the trial court erred, Appellant was not harmed because the substance of the mistake-of-fact instruction was adequately covered by the jury charge as given.

We agree that Appellant was not harmed by any error in the omission of the requested instruction because the charge instructed the jury that it must find each of the

29

essential elements of the offense with which Appellant was charged beyond a reasonable doubt. One of those elements was Appellant's knowledge that his conduct was unlawful. The charge clearly instructed the jury what it was required to find and thus, the lack of a specific mistake-of-fact instruction did not harm Appellant. *See Sands v. State*, 64 S.W.3d 488, 496 (Tex. App.—Texarkana 2001, no pet.) (finding that the required determination of whether the defendant intentionally and knowingly possessed methamphetamine placed squarely in point the question of whether the defendant mistakenly believed that the contents of the syringe contained vitamins, or he intentionally and knowingly possessed methamphetamine. Under those circumstances, the defendant was not denied the right to have the jury consider the mistake of fact defense he raised).

**Texas Penal Code Section 9.22—Necessity**

Necessity is a justification defense that excuses a defendant's otherwise unlawful conduct if (1) the defendant reasonably believed the conduct was immediately necessary to avoid imminent harm; (2) the desirability and urgency of avoiding the harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear. TEX. PENAL CODE ANN. §§ 9.02, 9.22 (West 2020); *Young v. State*, 991 S.W.2d 835, 838 (Tex. Crim. App. 1999). Necessity is a confession-and-avoidance defense, meaning that a defendant is not entitled to a necessity instruction unless he admits to the conduct—both the act and the culpable mental state—of the charged offense and then offers necessity as a justification*. Juarez v. State*, 308 S.W.3d 398, 399 (Tex. Crim. App. 2010). In other words, the defendant must "admit" or confess to violating the statute under which he is

30

being tried, then offer necessity as a justification for his otherwise criminal conduct. *Young,* 991 S.W.2d at 838.

Appellant argues he requested the inclusion in the jury charge of an instruction regarding necessity. The trial court denied it and thus, Appellant contends we must find error here if there is some evidence in the record that the omission harmed him. Appellant asserts that because "necessity is a justification, a jury who believed his necessity defense would be obligated to acquit Appellant of the offense of Official Oppression. Appellant, therefore suffered harm as a result of the trial court's erroneous denial of his requested necessity instruction and warrants this Court's reversal and remand."

The State argues that because Appellant did not admit to knowledge that his conduct was unlawful, he was not entitled to an instruction regarding the defense of necessity and thus, the trial court did not err in omitting it. We must agree. As noted, to be entitled to a necessity instruction, a defendant must admit both the act and the culpable mental state and then offer necessity as a defense. *Juarez*, 308 S.W.3d at 399; *Young*, 991 S.W.2d at 838. Appellant did not do so here and thus we cannot find the trial court erred in omitting an instruction concerning the necessity defense.

**Texas Penal Code Section 9.21—Public Duty**

Penal Code section 9.21 provides a generalized "public duty" defense to crimes. That statute provides a defense if "the actor reasonably believes the conduct is required or authorized by law." TEX. PENAL CODE ANN. § 9.21(a). Subsection (d) provides that the justification afforded by this section is available if the actor reasonably believes: (1) the court or governmental tribunal has jurisdiction or the process is lawful, even though the

31

court or governmental tribunal lacks jurisdiction or the process is unlawful; or (2) his conduct is required or authorized to assist a public servant in the performance of his official duty, even though the servant exceeds his lawful authority. TEX. PENAL CODE ANN. § 9.21(d).

Appellant contends that the State's theory of the case as well as the inclusion of the instruction regarding the law of parties implicated the public duty instruction and the trial court's refusal to include it clearly harmed him.

The State argues the trial court did not err in refusing to include the requested instruction because the requested instruction was unnecessary because it only denied the existence of an essential element of the State's case, i.e., Appellant's knowledge that his behavior was unlawful, and thus, was redundant. Further, the State asserts that even if the trial court erred, Appellant was not harmed because the substance of the public duty instruction was adequately covered by the jury charge as given.

We agree that Appellant was not harmed by any error in the omission of the requested instruction because the jury charge instructed the jury that it must find each of the essential elements of the offense with which Appellant was charged beyond a reasonable doubt. One of those elements was Appellant's knowledge that his conduct was unlawful. The jury charge clearly instructed the jury what it was required to find and thus, the lack of a specific public duty instruction did not harm Appellant. A trial court may refuse to give requested instructions where the instructions given by the court are adequate and fully protect the rights of the accused. *Tovar v. State*, 165 S.W.3d 785, 792 (Tex. App.—San Antonio 2005, no pet.).

**Duties and Powers of Peace Officers**

Appellant asserts the trial court erred by failing to instruct the jury regarding the duties and powers of peace officers. Article 2.13 of the Texas Code of Criminal Procedure sets forth the duties and powers of peace officers. Subsection (a) provides, "It is the duty of every peace officer to preserve the peace within the officer's jurisdiction. To effect this purpose, the officer shall use all lawful means." TEX. CODE CRIM. PROC. ANN. art. § 2.13 (West 2020).

At trial, Appellant requested that the trial court include the following instruction to the jury:

DUTIES AND POWERS OF PEACE OFFICERS

It is the duty of every peace officer to preserve the peace within the officer's jurisdiction. To effect this purpose, the officer shall use all lawful means. The officer shall:

1. In every case authorized by the provisions of this Code, interfere without warrant to prevent or suppress crime; and

2. Arrest offenders without warrant in every case where the officer is authorized by law, in order that they may be taken before the proper magistrate or court and be tried.

On appeal, Appellant argues the trial court should have included his requested instruction concerning the duties and powers of peace officers because issues relating to the powers and duties of peace officers was discussed in great detail and at length during the trial. Appellant contends that the concepts and contents of article 2.13 were discussed during *voir dire* and referenced numerous times during trial, thus entitling him to his requested instruction.

The State disagrees, arguing that the instruction given by the trial court accurately stated the law applicable to Appellant's case and did so more specifically than the requested instruction. The court's charge included instructions regarding circumstances under which a police officer may arrest a person without a warrant and provided necessary definitions applicable to the duties and powers of a peace officer. Appellant's requested instruction would have been redundant and thus, the exclusion was not error. As noted, a trial court may refuse to give requested instructions where the instructions given by the court are adequate and fully protect the rights of the accused. *See Tovar*, 165 S.W.3d at 792.

### Definition of Probable Cause and Collective Knowledge

The court's charge to the jury included the following instructions:

A police officer may arrest without a warrant:

1. persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony, breach of the peace, public intoxication, or threaten [sic], or are about to commit some offense against the laws; or

2. when an offense is committed in his presence or within his view.

Where an arrest may be lawfully made without a warrant, the police officer making the arrest is justified in adopting all measures that he might adopt in cases of arrest under a warrant, except that a police officer making an arrest without a warrant may not enter a residence to make the arrest unless:

1. a person who resides in the residence consents to the entry; or

2. exigent circumstances require that the police officer making the arrest enter the residence without the consent of a resident or without a warrant.

Appellant requested that the trial court include in its charge to the jury the following definitions:

PROBABLE CAUSE

A Peace Officer may arrest, detain or seize a person when the facts and circumstances within the arresting officer's personal knowledge, or of which he has reasonable trustworthy information, are sufficient to occasion a person of reasonable prudence to believe an offense has been committed.

Probable cause is determined on the basis of facts available to the officer at the time of the arrest, and an officer may be shielded from liability even if he "reasonably but mistakenly conclude[s] that probable cause is present.

Probable cause for a warrantless arrest requires that, at the moment the arrest is made, the facts and circumstances within the arresting officer's knowledge or of which he has reasonably trustworthy information are sufficient to warrant a reasonable belief that the person arrested had committed or was committing an offense.

COLLECTIVE KNOWLEDGE

Probable cause may be supported by the collective knowledge of law enforcement personnel may rely on the totality of facts available to them in establishing probable cause.

As a general rule, terms do not need to be defined in the charge if they are not statutorily defined. *Middleton v. State*, 125 S.W.3d 450, 454 (Tex. Crim. App. 2003). However, terms which have a technical legal meaning may need to be defined. *Id.* (citations mitted). This is particularly true when there is a risk that the jurors may arbitrarily apply their own personal definitions of a term or where a definition of the term is required to assure a fair understanding of the evidence. *Id.* (citation omitted). Probable cause and collective knowledge are two such terms that are not statutorily defined.

Appellant argues that the trial court erred in denying his request to include in the charge to the jury definitions of probable cause and collective knowledge. He contends

that the cornerstone of this case was whether he knew the officers had probable cause to arrest Nutt. As such, he argues, "[f]ailure to include the requested definition of Probable Cause clearly caused harm to Defendant's ability to present a defense and ensure all jurors were applying the same legal standards and not their own arbitrary beliefs." He argues also that the State's expert witnesses discussed the collective knowledge doctrine and thus, he was entitled to his requested definition of that term.

The State argues that the instructions given by the trial court accurately stated the applicable law and determinations of probable cause and collective knowledge were not required by the jury to determine whether Appellant was guilty of the offense for which he was charged. Thus, there was no risk that jurors would apply their own personal definition and the jury did not need those definitions to understand the evidence or to make a decision. *See e.g., Middleton*, 125 S.W.3d at 454 (discussing necessity of definition of "probable cause").

We agree with the State's position that the trial court's instructions to the jury accurately set forth the applicable law such that the jurors did not need to apply their own personal definitions, nor was a definition of either term necessary to the jury's understanding of the evidence.

**Exigent Circumstances**

Appellant next makes the same argument with regard to his complaint that the trial court erred in failing to include his requested definition of the term "exigent circumstances." The trial court included in its charge to the jury the definition of "exigent circumstances." It stated, "Exigent circumstances that would justify a warrantless

intrusion by police officers into a residence are where the officer is in immediate and continuous pursuit of a person who is attempting to evade lawful arrest or detention."

Appellant asked the court to add to the definition that "A suspect may not defeat an arrest which has been set in motion in a public place by the expedient of escaping to a private place." The trial court denied that request and Appellant now argues that a definition of the term was necessary to ensure that all jurors determined the issue of probable cause and arrest based on the same legal definition or standard and that they not utilize an arbitrary definition or standard. Appellant argues he was harmed by this omission.

The State again asserts that the instruction given by the court accurately stated the law applicable to the case and did so more specifically than the addition requested by Appellant. *See Tovar*, 165 S.W.3d at 792. We agree. The requested instruction was not specifically related to exigent circumstances and was not required in this case. Accordingly, the trial court did not err in omitting the requested definition. Having resolved each subpoint against Appellant with regard to requested jury instructions and definitions, we overrule his fifth issue.

### ISSUE SIX—MOTION TO QUASH

The amended indictment in this case was a single-count indictment comprised of three separate paragraphs. Appellant filed a motion to quash the indictment, alleging that none of the paragraphs properly alleged an offense against him. Specifically, as to paragraph II, Appellant argued the State "has failed to allege an 'unlawful act,' rather simply stating, 'his right not to be deprived of his liberty without due course of law,' which

is neither criminal or tortious." Appellant contended that language "falls short of constitutional muster and [is] an overly broad characterization" such that it cannot be the underlying unlawful conduct supporting an allegation of official oppression. The trial court denied Appellant's motion.

Through his sixth issue, Appellant asserts the trial court erred in denying his motion to quash the indictment. He argues the portion of the indictment alleging the offense of official oppression did not provide Appellant with sufficient notice. The State disagrees, arguing the indictment tracked the applicable statutory provision and provided Appellant with adequate notice.

In considering a trial court's ruling on a motion to quash an indictment we employ a *de novo* standard of review. *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004). A criminal defendant is entitled to notice under both the United States and Texas Constitutions. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. To satisfy this notice requirement, an indictment must be "specific enough to inform the accused of the nature of the accusation against him so that he may prepare a defense." *Lawrence v. State*, 240 S.W.3d 912, 916 (Tex. Crim. App. 2007) (citing *Moff,* 154 S.W.3d at 601). An indictment is usually sufficient so long as it tracks the language of the penal statute that itself satisfies the constitutional requirement of notice. *Lawrence*, 240 S.W.3d at 916 (citing *State v. Mays*, 967 S.W.2d 404, 406 (Tex. Crim. App. 1998)). An indictment does not have to include facts that "are merely evidentiary in nature." *Smith v. State*, 309 S.W.3d 10, 14 (Tex. Crim. App. 2010) (citing *Mays*, 967 S.W.2d at 406).

Appellant was charged with the offense of official oppression under section 39.03(a) of the Texas Penal Code. That provision provides, in relevant part:

> (a) A public servant acting under color of his officer or employment commits an offense if he:
>
>> (1) intentionally subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful;
>>
>> (2) intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity, knowing his conduct is unlawful[.]

TEX. PENAL CODE ANN. § 39.03(a).

As previously noted, Appellant was charged via a three-paragraph grand jury indictment. The State proceeded to trial only on Paragraph II which read: on or about the 2nd day of May, 2017, Appellant did "then and there, knowing his conduct was unlawful, intentionally deny or impede Cory Nutt in the exercise or enjoyment of a right, namely, his right not to be deprived of his liberty without due course of law, by detaining, seizing and arresting Cory Nutt . . . ." As such, the indictment charging Appellant with official oppression tracked the statutory language set forth in section 39.03(a)(2) of the Penal Code. *See* TEX. PENAL CODE ANN. § 39.03(a)(2). It also provided the manner and means of the unlawful conduct, i.e., "by detaining, seizing and arresting Nutt." In so specifying, it provided Appellant sufficient notice of the charge against him. *Lawrence*, 240 S.W.3d at 916. This is true even though the manner and means includes language set forth in section 39.03(a)(1) of the statute. The fact that the manner and means happens to be the same conduct as that set forth in subsection (a)(1) does not indicate the State failed to provide adequate notice. The manner and means could have been anything that rose

39

to the level of unlawful conduct. Here, it just happened to be the same conduct set forth in another section of the official oppression statute.

Nevertheless, Appellant argues that to prepare his defense, the indictment should have included notice of the conduct alleged to be unlawful. The Penal Code defines "unlawful" as "criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege." TEX. PENAL CODE ANN. § 1.07(a)(48) (West 2020). While the State was indeed required to prove the acts in which Appellant engaged that constituted unlawful conduct, it was not required to include those in the indictment. Those acts were "merely evidentiary in nature." *Smith,* 309 S.W.3d at 14. The record before us includes ample evidence of Appellant's acts that amounted to unlawful conduct from which the jury was free to find him guilty. The State was not, however, required to plead those evidentiary facts in its indictment. Accordingly, we find the trial court did not err in denying Appellant's motion to quash the indictment and we overrule this issue.

### ISSUE SEVEN—MOTION TO ELECT AND QUASH PORTION OF INDICTMENT

On the morning of trial, Appellant filed a motion requesting that the court find Paragraph II of the amended indictment improperly joined two offenses into a single charge and he asked the court to "sever" the charges, to direct the State to elect the charge on which it intended to proceed, and to "order the State to amend consistent with that election." The trial court heard arguments of the parties and thereafter denied Appellant's motion. Via his last appellate issue, Appellant argues the trial court erred in denying his motion to elect and quash portions of the amended Count I, and Paragraph II of the indictment.

The State argues it did not improperly join two offenses into a single charge and that there was no reason to sever or elect the charges because the State proceeded only on one charge, that set forth in Paragraph II.

Paragraph II of the amended indictment reads in pertinent part:

Defendant did then and there, knowing his conduct was unlawful, intentionally deny or impede Cory Nutt in the exercise or enjoyment of a right, namely, his right not to be deprived of his liberty without due course of law, by detaining, seizing and arresting Cory Nutt . . . .

The relevant statute provides as follows:

OFFICIAL OPPRESSION

(a) A public servant acting under color of his office or employment commits an offense if he:

(1) intentionally subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful;

(2) intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity, knowing his conduct is unlawful; or

(3) intentionally subject another to sexual harassment.

TEX. PENAL CODE ANN. § 39.03.

First, we note, as did the State, that Appellant's motion seems to object to the form and substance of the indictment. If so, it was untimely as it was filed the morning of the first day of trial. *See* TEX. CODE CRIM. PROC. ANN. art. 1.14(b) (providing "If the defendant does not object to a defect, error, or irregularity of form or substance in an indictment or information before the date on which the trial on the merits commences, he waives and forfeits the right to object to the defect, error, or irregularity and he may not raise the

41

objection on appeal or in any other postconviction proceeding. Nothing in this article prohibits a trial court from requiring that an objection to an indictment or information be made at an earlier time in compliance with Article 28.01 of this code").

However, even if it was not such an objection but rather truly was a motion to sever or elect, we cannot find the trial court erred in denying Appellant's motion. Paragraph II did not combine two offenses. Rather, it tracked the statutory language set forth in section 39.03(2) of the Penal Code and alleged that the manner and means of the unlawful conduct was by detaining, seizing, and arresting Nutt. As we discussed in our analysis of Appellant's sixth issue, the manner and means could have been any act if the State was able to prove it was unlawful. The alleged manner and means just happened to be the same as the acts set forth in section 39.03(a)(1) of the Penal Code. This did not, however, mean the State "co-mingled" the two offenses or that it otherwise improperly charged Appellant.

Moreover, even if we assume error, it is harmless. Section 3.02 of the Texas Penal Code provides that a defendant may be prosecuted in a single criminal action for all offenses arising out of the same criminal episode. TEX. PENAL CODE ANN. § 3.02(a) (West 2011). If the State properly joins two offenses pursuant to section 3.02, the defendant has the right to sever the cases into different trials, provided he timely invokes that right. TEX. PENAL CODE ANN. § 3.04(a) (West 2011). A defendant's right to severance is absolute and the severance is mandatory when the defendant timely requests a severance under section 3.04(a). *Kelley v. State*, Nos. 07-16-00396-CR, 07-16-00397-CR, 2017 Tex. App. LEXIS 12019, at *4 (Tex. App.—Amarillo Dec. 21, 2017, pet. ref'd) (mem. op., not designated for publication).

If we assume that the State joined more than one offense and if we assume the trial court erred in denying Appellant's motion to sever or elect, we nevertheless cannot find Appellant was harmed.  Severance error is not a structural error and is subject to harm analysis under Texas Rule of Appellate Procedure 44.2(b).  *Kelley*, 2017 Tex. App. LEXIS 12019, at *5 (citing *Llamas v. State*, 12 S.W.3d 469, 470-71 (Tex. Crim. App. 2000)).  Errors that do not affect a substantial right must be disregarded.  *Kelley*, 2017 Tex. App. LEXIS 12019, at *5 (citing TEX. R. APP. P. 44.2(b)). A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict.  *Kelley*, 2017 Tex. App. LEXIS 12019, at *5 (citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)).  If the error did not adversely affect the defendant's substantial rights, then it is harmless.  *Kelley*, 2017 Tex. App. LEXIS 12019, at *5 (citing TEX. R. APP. P. 44.2(b); *Werner v. State*, 412 S.W.3d 542, 547 (Tex. Crim. App. 2013)).

We "assess harm after reviewing the entirety of the record, including the evidence, jury charge, closing arguments, voir dire, and any other relevant information."  *Kelley*, 2017 Tex. App. LEXIS 12019, at *5 (citing *Werner*, 412 S.W.3d at 547 (citing *Schutz v. State*, 63 S.W.3d 442, 444-45 (Tex. Crim. App. 2001)).  The most important factor in determining whether a trial court's failure to grant severance was harmful is the overlap in evidence that would have been admissible had the trials been severed.  *Kelley*, 2017 Tex. App. LEXIS 12019, at *5 (citing *Werner*, 412 S.W.3d at 549).

Here, whether the State proceeded on a charge under section 39.03(a)(1) or 39.03(a)(2), the evidence presented at trial would have been identical.  The State alleged that Appellant's unlawful conduct was impeding Nutt in the exercise or enjoyment of a right by arresting him.  It was irrelevant which of the sections Appellant was charged

with—the evidence, witnesses, and arguments would have been the same. As such, severance or election would have had no bearing on the outcome here. Accordingly, we resolve Appellant's final issue against him.

### CONCLUSION

Having overruled each of Appellant's issues, we affirm the judgment of the trial court.

Patrick A. Pirtle
Justice

Do not publish.